Pee Cueiam:
This case was referred to Trial Commissioner W. Ney Evans with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on January 11, 1966. Exceptions to the commissioner’s findings and briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover disability retirement pay, computed on the basis of a disability rating of 40 per centum, from the day following the day of his release from active duty, less the amount received as severance pay at the time of his separation, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47 (c).
OPINION OP COMMISSIONER*
Evans, Commissioner:
By this action plaintiff, formerly an officer in the Naval Reserve, seeks to recover an amount representing the difference between the disability severance pay he received as of November 29, 1956, and (1) the active duty pay and allowances of a lieutenant commander with his length of service or (2) the disability retirement pay of a lieutenant commander with his length of service computed on the basis of a percentage of disability of 30 percent or more. His severance pay was based upon a disability rating of 20 percent. He contends (1) that his separation was effected in violation of regulations having the force of law which required (a) that he be represented by appointed counsel before the Physical Disability Appeal Board and (b) that he be given a physical examination prior to separation; and (2) that his separation with disability severance pay, as unfit to perform the duties of his rank by reason of physical disability of less than 30 percent, was arbitrary, capricious, unsupported by substantial evidence, and unlawful.
*281 I
Pursuant to the terms of the Career Compensation Act of 1949, as amended,[1] the Secretary (of the Navy, in this instance) may (1) retire an officer entitled to basic pay, with retired pay, upon a determination by the Secretary that the officer is unfit to perform the duties of his rank because of physical disability, if the Secretary also determines (a) that based upon accepted medical principles, the disability is of a permanent nature and (b) that the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Veterans Administration and (c) that the officer has at least 8 years of service;[2] or (2) the Secretary may place the officer’s name on the temporary disability retired list, with retired pay, upon a determination that the officer would be qualified for retirement as above but for the fact that his disability is not determined to be, but according to accepted medical principles may be of a perma/nent nature; [3] or (3) the Secretary may separate the officer, with severance pay, upon a determination as in (1) above, except that with respect to permanence, the determination is that the disability “is or may be” of a permanent nature, and that the degree of disability is less than 30 percent.[4]
Final determination of the percentage of disability is, in any event (retirement, placement upon the temporary disability retired list, or separation), vested in the Secretary. The channels through which advice is formulated and transmitted to the Secretary of the Navy are defined by regulations contained in supplements to the Manual for Courts Martial.[5] As outlined in the findings, they consist of (1) a Clinical Board; (2) a Physical Evaluation Board; (8) a Physical Review Council; and (4) a Physical Disability Review (formerly “Appeal”) Board.
Plaintiff in this case went through channels twice before he was finally separated. His contention that the separation was invalid because he was deprived of counsel before *282 either of the Physical Disability Appeal Boards is founded upon language in the regulations governing the proceedings before these Boards directing that “appellate counsel for the party shall be designated * *
Each time plaintiff’s case was before a Physical Disability Appeal Board, the Board decided that his presence was not necessary. The Secretary’s final determination reflected the adoption by him of the recommendation submitted by the second Physical Disability Appeal Board. No counsel was appointed for plaintiff by either Board, nor did he appear in person, or have representation by counsel, before either Board.
As noted by defendant in its brief, the mandate that “appellate counsel for the party shall be designated * * *” must be read in context. To that end the text of the first three paragraphs of section 0945 is set forth below.
0945. geNebal INSTRUCTIONS. — a. Procedure. — The Physical Disability Appeal Board, upon concurrence of a majority of the membership, may cause a record to be returned to a medical board or a physical evaluation board for the same reasons that it may be returned by the Physical Review Council, but such record shall be returned via the Physical Review Council. Where the Appeal Board takes action other than to so return the record, such action will be based on that evidence which was adduced before the physical evaluation board unless the party or his counsel has been given opportunity to appear and present evidence before the Appeal Board, or has consented to the consideration of other evidence by the Appeal Board, or has waived his right for final disposition based only on the evidence before the physical evaluation board. Proceedings before the Appeal Board may be solely on the record or may be adversary in nature. In the former, the Appeal Board shall take action upon such evidence as it legally may consider, which shall be presented to the Appeal Board by the recorder. In an adversary proceeding the Appeal Board shall take action on the evidence in the same manner as in the former case except that it will also consider further arguments presented to the Appeal Board by appellate counsel for the party and, if desired by the President of the Appeal Board, by the recorder. Such arguments shall be submitted as prescribed by the President of the Appeal Board and may be either written *283 or oral as be may direct. Tbe President of tbe Appeal Board may, in bis discretion, in any adversary proceeding, if requested, allow tbe party concerned or his legal representative to appear and present evidence before tbe Appeal Board, and such evidence, together with other evidence of probative value then presented by him or on behalf of the Government, may be considered by the Appeal Board in arriving at its decision. The nature of the proceedings before the Appeal Board in any particular case shall be as determined by the President of the Appeal Board unless it is directed by the Secretary of the Navy that they be adversary in nature. The party concerned has no right to demand that proceedings before the Appeal Board be adversary; in nature.
1). Disposition. — After consideration of the evidence before it, the Physical Disability Appeal Board shall render an advisory opinion for the Secretary of the Navy as to the appropriate recommended findings upon which it considers that final disposition of the case should rest. The Appeal Board may, in its discretion, set forth the basis for its opinion and shall do so in the same manner as prescribed for physical evaluation boards in section 0913y where the basis is not otherwise adequately set forth in the record. Any dissenting member of the Appeal Board shall make a minority report on those particulars in which he dissents. Such report shall be included in the record of the Appeal Board.
g. Appellate Counsel. — Appellate counsel for the party shall be designated by the Judge Advocate General and shall consist of one or more officers. In an adversary proceeding before the Appeal Board the party concerned may be represented by civilian counsel when it does not cause undue delay in the appeal proceeding and if provided by him or his representative at no expense to the Government. In such case the designated appellate counsel for the party, unless his assistance is requested by the civilian counsel, shall not act in the case. Within five days excluding Sundays and holidays after notification of the advisory opinion and any dissent rendered by the Appeal Board, appellate counsel may file an argument in rebuttal to the advisory opinion or dissent of the Appeal Board. In exceptional cases and upon request the time for filing such argument may be extended in the discretion of the President of the Appeal Board.
After citing the foregoing text, defendant’s brief asserts:
The Department of the Navy has always interpreted these regulations as requiring counsel only when there *284 is an adversary bearing. Wben the case is considered solely on the record, afl that is reviewed is the record that was before the Physical Evaluation Board plus plaintiff’s rebuttal. No counsel is needed nor required. This we submit is a reasonable interpretation of the regulations.
The record presents nothing more than the representations by counsel. No evidence was adduced pertaining to the Navy’s practices in this particular.5a
Under the circumstances the writer is constrained to agree with defendant as to the reasonableness of its interpretation that no counsel was required when the case was, as here, considered solely on the record.[6]
Plaintiff’s contention that his separation was void for lack of a final physical examination fails for similar reasons.[7]
Plaintiff relies upon the provisions of Article C-10412, Bureau of Naval Personnel Manual, and Article 15-49, Manual of the (Navy) Medical Department, the texts of which follow in pertinent part:

Article G-10412

A complete physical and dental examination shall be given to all personnel at the time of their separation, except that such examination in the cases of personnel being separated upon the approved report of a board of medical survey, a clinical board or a physical evaluation board shall be given only if requested by the person being separated.

*285
Article 15-49

An officer who has appeared before a physical evaluation board incident to being separated from the active list need not be reexamined physically at the time separation is to become effective unless it is considered that his physical condition has materially changed subsequent to appearance before the physical evaluation board or unless he alleges that such is the case.
Plaintiff did not request a physical examination at the time of his separation; nor did he allege that his physical condition had materially changed subsequent to his last appearance before the Physical Evaluation Board.
In the light of the foregoing facts, his contention is reduced to the technical assertion that he was not “separated upon the approved report of * * * a physical evaluation board” within the meaning of the Personnel Manual. Yet, as pointed out by defendant, the crucial directive issued by the Office of the Judge Advocate General on October 22, 1956, “by direction of the Secretary of the Navy,” recited:
The proceedings and findings of the Physical Evaluation Boards in the cases of the following listed members of the naval service, as concurred in or modified by the action of the Physical Review Council (and-the Physical Disability Appeal Board, if applicable) are * * * approved; and it is directed that the below indicated action be taken. * * *
$ $ $ $ $
* * * To be separated from the naval service by reason of physical disability * * *:
LCDR Norman E. Cooper * * *
In order for plaintiff’s contention to be sustained, the Personnel Manual would have to be read as providing for exemption from the final physical examination only “in the cases of personnel being separated upon the approved report [ without modification] of a board of medical survey, a clinical board, or a physical evaluation board.” The Manual of the Medical Department, on the other hand, provides only that “an officer who has apfeared before a physical evaluation board incident to being separated * * * need not be reexamined * * When the two are read together, the inference is clear that the emphasis of the regulations is upon a *286 physical examination having been provided recently and as an incident of separation, and not upon any possible concurrence of the evaluee with the findings of the medical boards or nonconcurrence by him in any modifications thereof by a Physical Beview Council or a Physical Disability Appeal Board.
It is my conclusion that plaintiff’s separation was not procedurally defective, wherefore his claim for active duty pay and allowances must be denied.
II
When plaintiff testified at the trial of this case, in January 1964, he appeared to be what the medical fraternity would describe as “a well-nourished male.” He was then 44 years of age. Impressions gained from his appearance at that time were superficial. He was suffering, physically, from an ulcer condition, and was handicapped mentally by a condition known as psychotic depressive reaction.
The ulcer condition was service-connected: it was the cause of his separation from the Navy, in November 1956, for physical disability, rated at 20 percent under VA Code 7805, “moderate.” Since his separation, the ulcer condition, as he testified, had either grown progressively worse, or he had been worn down by it.
The mental condition was not service-connected, in the accepted, official sense. Occasional symptoms of psychiatric difficulty had appeared while he was an officer in the Navy, but they were never pronounced, or deemed serious enough to warrant treatment. Within a limited degree, his psychotic symptoms had been related to what physicians term the ulcer personality, but the serious effects of those symptoms were not revealed by psychiatric examination prior to his release.
After plaintiff’s separation from the Navy, the incapacitating effects of his ailments, both physical and mental, became more pronounced, as evidenced by his employment record. During the 3 years (1957-1959) following his release from the Navy, he held a series of jobs: as an airplane pilot, for one; and three or four stints as a salesman; but none lasted more than a few months. In 1960 he accepted *287 a position as sexton of a church, and was so employed at the time of trial, performing light, and sometimes menial chores.
In support of his claim of wrongful action by the Navy in failing to assess his disability at 30 percent or more, in lieu of the 20 percent accorded to the ulcer condition, plaintiff offered evidence of the existence, prior to his separation, of degenerative arthritis. While one of the Navy doctors said, in the course of an examination, that a minimal degenerative arthritis of the joints of the hands and knees, manifested by pain, could not be denied on the basis of subjective complaints alone, the diagnosis was never confirmed or documented radiologically, although efforts to do so were made more than once.[8]
It is not established by the evidence that at the time of his separation from the Navy plaintiff was suffering from any disability, physical or mental, ratable under the VA Code, except that of duodenal (peptic) ulcer. His effort to show that action by the Navy in rating his disability at less than 30 percent was arbitrary, capricious, unsupported by substantial evidence, or unlawful, must stand or fall on the analysis accorded to his uloer condition.
Ill
The ground rules for measuring this effort have been well developed in a series of decisions by this court, most of them quite recent.
In Furlong v. United States, 153 Ct. Cl. 557 (1961), the court referred to the claimant’s “burden of showing by cogent and clearly convincing evidence that [the finding of] the * * * Board was arbitrary or capricious * * [9] saying:[10]
* * * There is, of course, a strong presumption that the * * * Board and the Secretary faithfully discharged the duties imposed upon them by law. Only *288 clearly convincing proof can induce us to bold that a retiring board or the Secretary had arbitrarily or capriciously denied an officer retired pay to which he was entitled. Bad faith will not be attributed to them, unless we are clearly convinced of it. Absent a showing of arbitrary or capricious action, we have no jurisdiction to review the action of the * * * Board and the Secretary. We cannot substitute our judgment for theirs * * *. [Cases cited.] It is only where the decision of the board is clearly unsupported by substantial evidence or when there was a non-compliance with applicable laws and regulations that this court may interfere with the findings of the board. * * *
Inasmuch as defendant rests its entire case (on this aspect) upon Furlong, it is appropriate to note the distinctions there suggested by the court between (1) arbitrary or capricious (equated with bad faith); (2) unsupported by substantial evidence; and (3) noncompliance with applicable laws and regulations (unlawful).
Snell v. United States, 168 Ct. Cl. 219, 227 (1964), is authority for the following proposition: “* * * the fact that there is reasonable ground for disagreement with the Secretary’s determination does not mean that the determination was arbitrary or capricious.”
And, “* * * the fact that plaintiff’s condition may have deteriorated subsequent to his release from service is not of itself determinative of the issue * * Johnston v. United States, 157 Ct. Cl. 474, 478 (1962).
Where “* * * there was substantial evidence to support the findings of the * * * Board, * * * plaintiff has failed in his burden.” Boland v. United States, 169 Ct. Cl. 145 (1965).
On the other hand, the administrative decision must have been “conscientiously made.” Golding v. United States, 131 Ct. Cl. 677, 680; 130 F. Supp. 628 (1955).
And the rule of Hordechuck, as stated in Wolf v. United States, 168 Ct. Cl. 24 (1964), is that “when a member of the military service is diagnosed as having a condition described in the Veterans Administration Schedule, and the code for that condition carries with it 'a minimum percentage’ rating, the member is automatically entitled to at least that rating, there being no authority for reducing percentages beyond *289 tnose found in the schedule itself. Hordechuck v. United States, 144 Ct. Cl. 492 (1959).”
In Hordechuck, the court said “* * * the 'Secretary acted contrary to the Career Compensation Act.” [11] In short, his action was unlawful. In Wolf, supra, at 32, the court said “* * * the decision of the * * * Board and the Secretary was arbitrary and not supported by the evidence.”
“* * * [T]he Veterans Administration’s findings are not binding on this court, but its determinations of the degree of disability may well be persuasive.” Wolf, supra, at 31, citing Andrews v. United States, 163 Ct. Cl. 126 (1963).
The decision in Andrews, supra, at 132, 133, holding that “the essential point is that the * * * Physical Keview Council and Disability Appeal Board misinterpreted the Diagnostic Code,” further noted at 132 that “it * * * is significant that most of the medical doctors who actually examined plaintiff found him more than 30 percent disabled.”
Appended to the sentence just quoted from Andrews is a footnote, a portion of which follows:
* * * The language in various parts of the general policy [for rating disability under the VA Schedule] states that the actual rating must depend upon the degree of disability. The general policy statement indicates that the ratings apply to an average case and may be changed up or down in the light of the severity of the disease or disability, and that in many instances the schedule percentage is the minimum.
The Schedule also states * * * that the policy of the Veterans Administration is “to administer the law under a broad interpretation * * * [and that if] a reasonable doubt arises regarding * * * the degree of disability * * * such doubt will be resol/oed in favor of the claimants * * * [Emphasis supplied.]
As hereinafter noted, plaintiff stresses (1) the fact that the physicians who examined him and heard his testimony rated his disability (from the ulcer condition) at 40 percent, whereas the reduced percentages were imposed by boards who had never seen or heard him; and (2) the application of the “reasonable doubt” policy to the circumstances of his case.
*290 IY
In. tbe course of his 15 years of service in the Navy,[12] plaintiff was given numerous physical examinations relating to his fitness for duty and to various illnesses and ailments other than the ulcer condition.
His health records during the 14 years of 1941 through 1954 contain entries of physically qualified for duty resulting from 24 separate examinations. No such entries are in evidence for 1955 or 1956.
During those 14 years (1941-1954), he had an operation for acute appendicitis in October 1942; was treated for a third degree bum 2 months later (December 1942); suffered a severe bout with fever[13] in the spring and summer of 1946; had a protracted siege of sinusitis during the spring and summer of 1949; was seen in the psychiatric out-patient clinic five times during September and October 1949;[14] was treated for cold, fever, and influenza in February and March 1951; was examined for symptoms of arthritis in August 1953;[15] and had a return flare-up of sinusitis in November 1953.
Plaintiff’s ulcer history began (of record) in March 1945, when he reported that he had begun to experience epigastric pain about a year earlier, with discomfort, excess gas in his stomach, and heartburn. As of March 1945, he reported some nausea and anorexia.[16] The pain was then fairly diffuse rather than sharply localized. The physician observed that plaintiff did “not appear to be acutely ill.” Pie was given a regimen of diet and medication which resulted in prompt *291 relief of bis distress. A fluoroscopic examination of the esophagus, stomach, and duodenum was negative. These findings were confirmed by serial radiographs “except for the presence of an elongated, rather tortuous shadow extending upward and mesially from the upper and medial border of the duodenal cap, seen in two films.”
A repetition of the GI series 4 days later resulted in findings: “fluoroscopic exam, negative; duodenum fills well and readily with the opaque meal, with no apparent spasm or filling defect”; findings confirmed by serial radiographs; “the shadow previously described as arising from the duodenal cap is believed to represent the second portion of the duodenum, and not a pathological condition. Impression: normal GI series. Diagnosis changed to hyperchlorhy-dria[17] * * *.”
One year later, in April 1946, plaintiff suffered a recurrence of the abdominal pain. He was given cremalin, and the pain cleared. He had no nausea, vomiting, or diarrhea. A repeat GI series was negative.
In June 1949, while plaintiff was under treatment for sinusitis, he “insidiously” developed epigastric pain, nausea, and anorexia. Another regimen of diet and medication relieved his distress.
Almost 3 years passed before the next episode, in March 1952. On that occasion the medical findings were as follows:
* * * Fluoroscopy of chest with barium swallow revealed no inflammation. Following with barium meal the motility of the stomach was active and the outline of the fundus was normal. The duodenal bulb filled readily and emptied spontaneously. Films including spots of duodenum and four hours later reveal no evidence of active pathology. Imp[ression]: Essentially normal upper GI tract.
After another 2 years, in April 1954, the symptoms were more pronounced. Since his history “sounds as though it might be duodenal ulcer,” another GI series was performed, and again found to be negative. A repeat series made 1 month later, however, in May 1954, “revealed an ulcer crater of the duodenum.” When a strict diet for 1 week failed to give “satisfactory relief of pain,” plaintiff was hospitalized *292 with the diagnosis: “ulcer, duodenum (without obstruction).” The hospital record contains the following entry:
* * * The patient described his symptoms as dull, gnawing, or cramping epigastric distress of no predictable onset, but often occurring 1% hours after meals, more often in the afternoons, and whenever he was tense or excited. The pain has tended to be cyclic in its occurrence — being aggravated for 7-10 days and then quiescent for 4 — 5 days. Self-induced vomiting, heavy cream and Amphojel has relieved the pain. * * * Follow-up GI series demonstrated gradual healing of the duodenal ulcer.
During this same period of hospitalization (June-July 1954) plaintiff was given a neuropsychiatric consultation “in conformity with patient’s own desires.” The report was: “Mild anxiety was evident, but there was not considered to be any manifest disability that would require therapy.”
In August 1954, 3 weeks after plaintiff’s release from the hospital, a reevaluation of the duodenal ulcer therapy was made, in consequence of which still another GI series was made, which “did not demonstrate any evidence of peptic ulcer,” although “following return to duty there was a gradual return of previously experienced symptoms which have slowly become more aggravated.”
Another episode in February 1955 was severe enough to send plaintiff back to the dispensary for further examination. Since his “epigastric distress [was] not completely relieved by ulcer” regimen, the examining physician ordered a gastroscopy, to “evaluate gastritis.” The gastroscopy was “normal,” wherefore the examiner reported that he did “not feel that this could be classified as gastritis.”
Within less than 4 months (June 1955), plaintiff was again in the hospital for a full review and treatment. The hospital physicians reviewed and recorded his medical history in considerable detail. Excerpts follow:
Diagnosis: duodenal ulcer. * * * he was asymptomatic until 1945 when he first develped dull, gnawing epigastric discomfort which was of no definite periodicity but often appeared about iy2 hours post-prandially. This mild epigastric pain more often appeared in the afternoon or when he was tense or excited. It also *293 tended to be cyclic in its occurrence, with an aggravation of symptoms for 7-10 days followed by a quiescent period of 4 to 5 days. Soon after the onset of these symptoms a GI series was done and this was reported as negative. The patient was advised to drink milk between meals and on this dietary regimen there was a gradual relief of symptoms. He was asymptomatic until May 1946 when he again developed the same previously experienced gastro-intestinal symptoms. A GI series was done * * * at * * * San Diego * * * and this was reported as negative. From then on he had epigastric discomfort with recurrence at irregular intervals. In 1951 symptoms became more severe and again a GI series was done at * * * Chincoteague, Md., and again was reported as normal. Symptoms then gradually abated on a modified sippy regimen but in January 1954 epigastric distress once more became prominent and tended to persist. He was then seen at this * * * hospital [Philadelphia]. A GI series done on May 13,1954 demonstrated an active duodenal ulcer. He was instructed as to diet and was also given Banthine and Phenobarbital. However, there was no dramatic improvement so he was admitted to this * * * hospital on 2 June 1954 with the diagnosis of ulcer, duodenum, NEC, without obstruction * * *. * * * A gradual healing of the duodenal ulcer was demonstrated by follow-up GI series. * * * He was discharged to duty on 23 July 1954. A follow-up GI series on 9 August 1954 did not demonstrate any evidence of peptic ulcer. However, following return to duty there was a gradual return of previously experienced symptoms which have slowly become aggravated. * * * a gastroscopy completed on 9 March 1955 was normal. On this current admission to the sick list he was experiencing dull gnawing, occasionally sharp, epigastric pain * * *. * * * The pain has continued to be cyclic in its occurrence with periods of aggravated symptoms lasting 7 to 10 days and relatively quiescent periods lasting 4 to 5 days.
■■■■ -.i-, a GI series revealed minimum spasticity of the bulb but not [sic] definite ulcer crater was demonstrated. * * * The patient was also seen in neuro-psychiatric consultation. He was considered to have the type of personality consistent with ulcer disease. He did not demonstrate any evidence of psychotic, neurosis or character disorder. Psychotherapy was not considered to be indicated. The patient’s course was uneventful. There was a gradual amelioration of symptoms * * *.
*294 [Three weeks later]: Diagnosis, changed to: ulcer, duodenum, NEC, without obstruction * * *. Eeason: Established. * * * At present the patient is asymptomatic; his condition is good. He has no limitations other than those imposed by the nature of the diagnosis with its tendency for recurrence. * * *
On July 19, 1955, plaintiff appeared before a Clinical Board consisting of three medical officers.[18] This Board had before it the hospital record reviewed immediately above. Its recommendation was that plaintiff appear before a Physical Evaluation Board, to which the Clinical Board forwarded the aforementioned hospital record.
Y
At this point it is pertinent to refer to the Veterans Administration Schedule for Eating Disabilities, by which the Physical Evaluation Board was bound in assessing the percentage of disability, if any. Extensive passages from the VA Schedule are quoted in finding 3. Present purposes will be adequately served by excerpts: first from the Statement of General Policy which precedes the detailed schedules.
* * * The percentage ratings represent as far as can practically be determined the average impairment in earning capacity resulting from * * * diseases and injuries and their residual conditions in civil occupations, of the various grades of severity as set forth * * *. Generally, * * * the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations, or illnesses, proportionate to the severity of the several grades. For the application of the schedule, accurate and fully descriptive medical examinations are required, with the emphasis at all times upon the limitation of aetwity imposed hy the disabling condition. * * * [Emphasis supplied.]
* * * Each disability must be viewed from the point of view of the veteran working, or seeking work.
*295 * * * It is the defined and consistently applied policy of the Veterans’ Administration to administer the law under a broad interpretation, consistent, however with the facts shown in every case. When after careful consideration of all 'procurable cmd assembled data, a reasonable doubt arises regarding * * * the degree of disability * * * such doubt will be resolved in favor of the claimant. * * *
[There follows a detailed definition of what is meant by a “reasonable doubt.”]
* * * Every element in any way affecting the probative value to be assigned to the evidence in each individual claim mast be thoroughly and conscientiously studied by each member of the rating board in the light of the established policies of the Veterans Administration to the end that decisions will be equitable and just as contemplated by the requirements of the law. [Emphasis supplied.]
* * * If there is a reasonable doubt, as above defined, as to which of two ratings shall be applied m any given case, the claimant is entitled to the higher. [Emphasis supplied.]
* * * The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body * * * to function under the circumstances of ordinary activity, that is, in daily life including employment. * * *
* * * In view of the number of atypical instances it is not expected, especially with the more fully described grades, that all cases will show all the findings specified. * * *
The VA Schedule contained the following general description of peptic ulcers:
* * * Gastric and duodenal ulcers, from the standpoint of history and disability, are characterized by periodic recurrence of activity, with intervals of almost complete absence of physical signs and relief symptoms. During the recurrences, the principal symptom is epi-gastric pain, manifesting characteristic time relationship to ingestion of food, or hunger, with relief by alkalies, or by food (duodenal or marginal ulcers). With the onset of complications, such as obstructions or adhesions, the symptoms are more continuous and the periodicity and punctuality less striking. * * *
*296 Tbe specific rating schedule for ulcer, duodenal, was listed under Code 7305, and set forth six ratings, from 100 down to 0, as follows:

Rating

Pronounced * * * totally incapacitating- 100
Severe * * *_ 60
Moderately severe; with continuous manifestations of anemia, malnutrition and impairment of ¡health, or with recurring incapacitating episodes averaging 10 days in duration and occurring several times a year- 40
Moderate; with recurring episodes of severe symptoms two or three times a year averaging a week or more or with continuous moderate manifestations_ 20
Mild; with recurring symptoms only once or twice a year— 10
Latent; or postoperative, healed, without subsequent symptoms in past two years_ 0
At the end of these percentage ratings, there appeared the following:
Note — Ratings for postoperative adhesions, or psychoneurosis with predominantly gastric fixation, are not to be combined with the above ratings.
VI
On July 22, 1955, the Physical Evaluation Board, then in receipt of the report of the Clinical Board and the medical history transmitted with that report, heard testimony by plaintiff (after assigning counsel to him), formulated its findings, and transmitted its report to the Physical Beview Council.
Plaintiff testified before the Board that he was at that moment in pain, and had been so for a period of 5 days: that the pain “increases and decreases in intensity and it isn’t at the same level all the time during the day”; that the episodes of pain normally “last about a week the shortest, and ten days the longest”; that during the current cycle (extending from sometime in May toward the end of July), he had “been having only two days free * * * ten days [of pain] and then two days [free] * * *”; although back in the winter he had had 4 or 5 days free, followed by 7 to 10 days of pain. He was, he said, on an ulcer diet, and while the doctor had not indicated anemia, plaintiff was drinking 3 quarts of milk each day. He reported on his routine of ingestion of food and medication, frequently followed by vomiting, and said his condition was “a little hard” on his family and his fellow officers.
*297 The Physical Evaluation Board consisted of one medical officer and two nonmedical officers. The medical officer was Captain George C. Thomas, USN. His specialty in the medical field is not identified by the evidence.[19]
In the report transmitted to the Physical Review Council, the Physical Evaluation Board entered the basic findings of unfit for duty by reason of ulcer, duodenum, NEC, without obstruction; that the disability was not due to intentional misconduct or willful neglect; that the member had completed at least 8 years of service; and, in conclusion, that—
* * * his disability is considered to be forty per cen-tum in accordance with the standard schedule of rating disabilities * * * Code Number 7305; Ulcer, duodenal — moderately severe; [and] that
* * * accepted medical principles indicate that his disability may be of a permanent nature.
One month and a half later, on September 8, 1955, the Physical Review Council informed plaintiff of its intention to recommend to the Secretary that his disability was ratable at 20 percent, because “your disability does not meet the criteria of the higher rating”; and also to recommend that plaintiff be separated from the service with severance pay. Plaintiff was told that he might submit a statement in rebuttal, which he did, as noted below.
Navy regulations created the Physical Review Council for the express purpose of reviewing the record of proceedings of the Physical Evaluation Board in the light of established medical, legal, and personnel policies and to express its views thereon for the information of the Secretary. Each Physical Review Council was to consist of three members representing respectively the Judge Advocate General, the Bureau of Personnel, and the Bureau of Medicine and Surgery. The individual composition of this particular Physical Review Council is not identified by the evidence.
It is not the function of the Physical Review Council to conduct hearings, and applications for personal appearances by evaluees are not entertained. The Council does, however, *298 receive and consider the evaluee’s rebuttal, if timely submitted.
Plaintiff made a timely submission of rebuttal in the form of a letter of approximately 1,000 words wherein he set forth in great detail his suffering from and embarrassment by the nausea and vomiting occasioned by his ulcer condition. He said his problem was such that he never ate anything “without having first located the nearest ‘head’ where” he could vomit.
On September 23, 1955, the Physical Review Council transmitted the record (in its entirety) to the Physical Disability Appeal Board, with the advice that the Council after considering the evaluee’s rebuttal, adhered to its decision to present to the Secretary its substitute finding of a 20 percent rating of disability.
The Physical Disability Appeal Board, as required by regulations, consisted of five members: two medical officers and three nonmedical officers.[20] Upon convening, on October 26, 1955, it decided that the presence of the evaluee was not necessary and proceeded to review plaintiff’s case on the record as transmitted to it. Its recommendation to the Secretary was that he approve the substitute finding by the Physical Review Council rating the disability at 20 percent “* * * VA Code Number 7305 — Ulcer, Duodenal — moderate * *
Two weeks later, on November 9, 1955, the Judge Advocate General’s office, in the name of the Secretary, noted approval of the action of the Physical Review Council and ordered that plaintiff be separated from the service by reason of physical disability, with severance pay. As of November 29, 1955, the date for plaintiff’s separation was fixed at December 9, 1955.
On that day (December 9, 1955) plaintiff’s request for a stay of execution was granted, and he was given 30 days within which to petition the Secretary for a review of the proceedings. The petition was forwarded on December 28, 1955. In it, plaintiff reported that he had recently been *299 examined by and was currently under the care of Dr. H. L. Bockus, a renowned gastroenterologist, whose report was expected on January 4, 1956; and that plaintiff anticipated an opinion by Dr. Bockus that plaintiff’s ulcer condition was moderately severe. The Secretary thereupon ordered plaintiff to appear once more before a Physical Evaluation Board.
On January 31,1956, plaintiff appeared before the second Physical Evaluation Board, the membership of which was completely different from the first Physical Evaluation Board.[21] The second Physical Evaluation Board had before it plaintiff’s medical history, but Dr. Bockus, whose presence had been anticipated by plaintiff, was unable to attend.
The Board thereupon heard plaintiff’s testimony.
In his testimony plaintiff reviewed his duty assignments up to the time of his hospitalization in June 1955, and repeated the substance of his prior testimony concerning the atomic cloud incident at Bikini and his experience with symptoms of arthritis. He also reported on his examination and treatment by Dr. Bockus, and reviewed his bouts with ulcer pain and discomfort (including diet and medication) in some detail and in much the same terms as heretofore noted. He was then cross-examined at some length by the Board.
The Physical Evaluation Board thereupon concluded, and announced, that sufficient evidence was not available for reaching a decision, and adjourned the hearing until the specialist (Dr. Bockus) could appear. The Board further directed that plaintiff be readmitted to the hospital for further examination of the possibilities of (1) radiation effects, (2) arthritis, and (3) anemia.
Five weeks later, on March 6, 1956, the Clinical Board (being the same as the one before which he had appeared in July 1955) submitted an addendum to its previous report wherein both radiation effects and arthritis were negatived (on the basis of blood smears and X-rays) and the whole physical examination was said to be within normal limits (subject, of course, to ulcer symptoms).
*300 Meanwhile, on January 19, 1956, Dr. Bockus had submitted his report on plaintiff in a letter to a Navy doctor.[22] The emphasis of the specialist’s report was upon plaintiff’s subjective complaints:
* * * I wondered about the personality configuration, and the possibility of deep seated anxiety. * * * [H]e has been recently surveyed by a Navy fitness board, and perhaps has been declared ineligible for duty. I am not too sure what role this may be playing in a total symptom configuration, and the interpretation of his subjective complaints.
He seemed a bit tense, but not unduely [sic] so, on physical examination. It is a little difficult to have him express himself freely. * * *
* * * Dr. Widmann’s films show no duodenal ulcer fleck, but did show a subtraction defect * * *. This type of defect is occasionally caused by * * * scarring from previous ulcer. * * * [I]t was possible to iron out this subtraction defect, and cause it to disappear. * * * [T]here is * * * nothing to suggest * * * duodenal adhesions.
* * * I think we are left here with a person who is having episodically duodenal ulcer-like distress, and who, evidently in June of this year, did have a small duodenal ulcer. * * * I believe the symptom configuration here is being influenced decidedly by a state of tension * * *. * * * I doubt very much if each time he has these symptoms, he has an active ulcer.
* * * I suspect that he will continue to have symptoms on a functional basis until his tensional situation is ironed out, whatever that may be.
On March 27, 1956, the matter again came before the Physical Evaluation Board, the medical officer of which (Captain Beals) was the same as the January 31 Board, although the other two members were different. Dr. Bockus’ report was submitted to the Board by plaintiff’s counsel, in lieu of testimony by the specialist, and plaintiff again testified in his own behalf.
On this occasion plaintiff told the Board that during the current winter he had experienced about 5 days free of symptoms followed by episodes lasting 10 days. He said further:
*301 * * * there really isn’t any pattern to it. * * * During one of these long episodes of seven, eight, nine, or ten days, I sometimes vomit only once or twice, and sometimes there are two or three days when everything I eat comes up * * *. So it goes from mild to what I consider severe vomiting. * * *
Plaintiff’s counsel concluded his summation before the Board with a request that plaintiff be placed on the temporary disability retired list.[23]
The Physical Evaluation Board of March 27, 1966, after deliberating on the evidence, recommended substantially the same findings as had been recommended by the Physical Evaluation Board of July 1965, concluding as follows:
* * * his disability is considered to be forty per-centum * * * YA Code * * * 7305; Ulcer, Duodenum, moderately severe, with continuous manifestations of impairment of health.
Less than 10 days elapsed before the Physical Review Council[24] advised plaintiff, on April 5, 1956, of its intention to recommend to the Secretary that it considered plaintiff fit for duty “because the evidence of record indicates that your defect does not impair materially your ability to perform the duties of your rank.”
On April 23, 1956, plaintiff submitted to the Physical .Review Council his rebuttal in a letter of some 1,500 words, wherein he reported:
* * * Throughout the almost entire year of these proceedings I have had continuous pain and suffering from my stomach. * * * I have * * * spells of pain existing for ten days or so, with only two or three days relief before I get another episode of the same duration. * * *
I have extreme difficulty in trying to perform my duties. * * *
* * * I was again X-rayed * * * by Dr. B. P. Widmann * * * on April 20,1956. He again confirmed my diagnosis *302 as an irritable duodenal bulb with duodenal ulceration. * * * His report is enclosed * * *.[25]
* * * I am not feigning a disability.
One week later, on April 30, 1956, the Physical Eeview Council transmitted to the Physical Disability Appeal Board the record of the proceedings before the (second) Physical Evaluation Board and plaintiff’s rebuttal of April 23, with the advice that the Council adhered to its decision and intended to recommend to the Secretary a finding that plaintiff was fit for duty.
On May 25, 1956, the Physical Disability Appeal Board convened. Its membership included two of the officers who had comprised the Physical Disability Appeal Board of October 1955, including one of the same medical officers.[26] Having decided that the presence of the evaluee was not necessary, it reviewed the case on the record as transmitted, and submitted to the Secretary the following “advisory opinion”:
That the proposed substitute finding of the Physical Review Council * * * should not be approved; that the recommended findings of the Physical Evaluation Board * * * should be approved with the * * * following substitution * * *:
That the party’s disability should be rated at 20% * * * as his disability is moderate and meets the criteria of the 20% rating under Veterans Administration Code #7305.
After an interlude of 10 days the foregoing recommendation was, on June 6, 1956, transmitted by the Judge Advocate General to the Physical Review Council “for further consideration, comment, as appropriate, and return to the Secretary * * On July 2, 1956, the Physical Review Council forwarded the record to the Secretary with the advice that the Council adhered to its recommended finding of fit for duty.
*303 The matter rested in the Secretary’s office for something over 4 months until, on October 15, 1956, the Secretary advised the Judge Advocate General of his desire to approve the recommendation of the Physical Disability Appeal Board (20 percent disability).
Thereafter, appropriate orders went through channels, and plaintiff was separated from the service, by honorable discharge, with severance pay, on November 29, 1956, for physical disability rated at 20 percent.
YII
In January 1958, plaintiff applied to the Veterans Administration for disability compensation. On the basis of plaintiff’s complaint to the VA that he thought he had ulcers of the stomach and that he also had feelings of depression, the VA conducted two examinations, one physical and one psychiatric.
For the physical examination the VA had before it the report made by Dr. Widmann in April 1956, together with X-ray films made at that time, the report made by Dr. Bockus, a report by Dr. Lyman Harrison[27] (under whose care plaintiff then was), and the record of the proceedings before the (second) Physical Evaluation Board. On July 9, 1958, the VA awarded plaintiff disability compensation based upon a 20 percent disability[28] for his ulcer condition.[29]
Although the VA psychiatric examination was extended and extensive, and revealed a serious condition of “psychotic *304 depressive reaction,” disability award on account thereof was denied on the ground that the disability was “not service incurred or aggravated.”
VIII
On June 25, 1958, plaintiff was examined by Dr. Milton H. Uhley, a Beverly Hills physician specializing in internal medicine and cardiology who had likewise done some research in gastroenterology. Plaintiff continued under Dr. Uhley’s care intermittently from that time until the date of trial (January 1964), when Dr. Uhley testified as a medical expert.
Defendant, in its turn (in September 1964), presented the testimony of a medical expert, Commander Fred H. O’Con-nell, USN, a specialist in internal medicine including the diagnosis and treatment of gastrointestinal diseases. While Commander O’Connell had never examined (or seen) plaintiff, he was not only qualified in the gastroenterological field, but had had extensive experience with the Legal Medicine Branch of the Navy’s Bureau of Medicine and Surgery, with the Division of Physical Qualifications and Records, and as a member of Physical Review Councils. He had never served as a member of a Physical Evaluation Board.
Each of these medical experts had his own opinion of the degree of plaintiff’s disability as of the period March-November 1956. Dr. Uhley based his opinion on his examinations of plaintiff from June 1958 through 1968, and on his knowledge of what he described as the peptic ulcer state. Commander O’Connell based his opinion on his knowledge of the ulcer disease, on plaintiff’s health records throughout his time in the Navy and on his own standards of objective judgments by the Navy medical and rating boards and how such judgments are and should be formulated.
The testimony of both of these medical experts is instructive to a layman.
In 1954, Dr. Uhley had published in one of the learned journals an article on methods for suspecting the presence of active duodenal ulcer by physical examination, wherein he called into question “the dictum, since the turn of the cen *305 tury, that the existence of the peptic ulcer state can be surmised only from the history, and that the physical examination is relatively unimportant.” He had proved to his own satisfaction, by studies of actual case histories, that “the physical examination, in the light of observations here * * * reported, has proven to be of inestimable value in suspecting the presence of active peptic ulcer, regardless of the patient’s history.” He was dissatisfied with reliance on histories obtained from patients, because—
* * * There are remarkable variations in perceptiveness of subjective phenomena. The inability to formulate subjective experiences into verbalizations may prevent adequate communication with the physician. Pain thresholds vary considerably. Patients may minimize or deny the existence of symptoms to serve particular psychic needs.
Dr. Uhley preferred to express his diagnosis of plaintiff in terms of “a syndrome defined as the peptic ulcer state * * * because notoriously this is an illness of chronicity, with flareups, presumably seasonal, spring and fall * * *, with greater or lesser degrees of intensification following emotional stress phenomena, which may or may not be apparent. * * * It is notoriously a relapsing disease.” The fact that his own X-rays of plaintiff did not show a demonstrable ulcer crater (until 1962) was deemed relatively unimportant. Likewise, pain, although it may be a major symptom of duodenal ulcer, is not necessarily an important element in the picture, since some patients have a higher degree of tolerance of pain than others (he characterized plaintiff’s tolerance as “inordinately high”), and the reporting of pain by a patient involves communication. Plaintiff, he said, was “a very compliant, obedient, very conscientious * * * hard-working individual who would, even though there was appreciable personal suffering, give the appearance of a sort of smiling and detached attitude.”
After expressing the opinion that in 1958 plaintiff was “quite ill,” Dr. Uhley was shown the report by Dr. Bockus and said he agreed with it, “* * * because I think he is saying the same thing I am.” Dr. Uhley continued: “The only thing which he amplifies which I have not gone into is the *306 fact that this is a person with what must be a very severe undercurrent of emotional stress * * *. We know that perhaps the single most significant factor in producing pyloro-spasm is stress of an emotional origin. The patient may not be aware of how distressed he is emotionally.”
On the basis of YA Code 7305, Dr. Uhley expressed the opinion that in 1956 as well as 1958, plaintiff’s incapacitation was moderately severe to severe. He agreed, on cross-examination, that equally qualified doctors could disagree on the degree of severity, as between moderately severe and severe, or as between severe and total incapacitation. While he did not address himself to the VA Code category of “moderate” as distinguished from “moderately severe,” he did say: “The difference might 'be whether this was severe or total incapacitation, or only moderately severe. I can’t see there would be any greater leeway than that.” He also said it was “incomprehensible * * * for a patient presenting symptoms of persistent bouts of vomiting and persistent presence of epigastric pain to be considered mild.”
Commander O’Connell, on the qther hand, while agreeing that equally qualified doctors could disagree on the extent of the disability, limited the range wherein qualified doctors might reasonably differ in plaintiff’s case to the difference between “moderate” and “mild.” Plaintiff’s medical record would not, in his opinion, under any circumstances, support a rating higher than “moderate” when tested by the criteria listed in the YA rating code.
On the basis of his own review of plaintiff’s medical records, Commander O’Connell said that as of April 1956, he would have rated plaintiff’s disability at 10 or 20 percent. Giving plaintiff the higher of the two (20 percent) would, he said, give plaintiff the benefit of the doubt. He explained:
* * * I see the patient’s history * * * in the last year * * * there is no problem with physical wasting; laboratory studies show no anemia; he has not been, for medical reasons because of incapacitation, confined to the hospital * * *; in spite of all the trouble he has which is so hard to pin down, * * * he still hasn’t produced anything of severity by my own standards * * * or by the standards of the YÁ; in fact his story changes even from time to time, and I am becoming more and more aware *307 of the fact that his personality makes contribution to his appreciation of pain, depending on how he feels. I wonder — at some times and in some moods he describes his disease optimistically and at other times he describes it quite pessimistically. But the reason I say, oh, okay 20, is because let’s assume that he has pain, or he has * * * severe symptoms recurring two or three times a year or more * * *; * * * so let’s give 20 for the sake of the benefit of the doubt to make sure we have got him covered. I am certainly not going to give him 40 when * * * the more objective things, are not demonstrated at all in his records.
Amplifying the foregoing in terms of the rating schedule requirements for “moderately severe,” Commander O’Connell found in plaintiff’s medical records no “continuous manifestations of anemia,” or “of malnutrition and impairment of health”; and no “recurring incapacitating episodes averaging 10 days in duration and occurring several times a year.” Incapacitating, he said, meant (medically speaking) “bedridden, hospitalized, or that an individual is unable to do the ordinary social domestic or official things for a man of his state.”
Commander O’Connell was queried as to how, on the basis of the medical evidence of record, he would account for the disparity of the conclusions reached by the various medical boards. One Physical Evaluation Board had made a finding of 40 percent; the Physical Review Council found 20 percent; the first Physical Disability Appeal Board concurred in the Council’s 20 percent finding; a de novo Physical Evaluation Board again found 40 percent, “with continuous manifestations of impairment of health”; the next Physical Review Council found plaintiff “fit for duty”; and the final Physical Disability Appeal Board rejected the finding and recommended 20 percent.
Commander O’Connell did not go into the subject in depth. He did, however, explain his reasons for discounting the findings of the Physical Evaluation Boards by saying that, from the standpoint of the Physical Review Councils, the recommendations of the Physical Evaluation Boards are often downgraded because (1) the one medical officer on the Physical Evaluation Board is in a position, as a medical *308 expert, to impose his judgment on his two nonmedical colleagues ; (2) the medical officer himself may be passing judgment outside of his specialty (as, for example, if the medical officers on plaintiff’s Physical Evaluation Boards had been specialists in such fields as orthopedics or genitourinary); and (3) the Physical Review Councils know that some experience is necessary for a medical officer on a Physical Evaluation Board to learn that he must abide by the terms of the VA rating schedules.
Commander O’Connell further indicated his belief that ratings based upon objective reviews of written records, by medical officers with some experience in such reviewing who never saw or examined the evaluee, were generally more reliable than ratings made on the basis of personal examinations, interviews, and observations.
IX
While plaintiff was, without question, seriously disabled at the time of trial, the evidence is equally clear that his condition (primarily his mental outlook) had deteriorated after his release from the Navy. Under the circumstances, the fact of such deterioration is not only not determinative of the issue, Johnston v. United States, supra; it presents a situation to be considered carefully, and in the light of all the evidence, lest it affect one’s judgment to the prejudice of the service that released him.
At the same time and by the same token, the fact that there is reasonable ground for disagreement with the Secretary’s determination does not mean that his determination was arbitrary or capricious. Snell v. United States, supra.
Plaintiff urges that he has not had the benefit of the reasonable doubt policy of the Veterans Administration Schedule. If this contention be deemed to be established as fact by clear and convincing evidence, it would suffice to vitiate the Secretary’s decision as unlawful, as in Hordechuck v. United States, supra, where the Secretary was deemed to have acted contrary to the Career Compensation Act when he reduced a rating below the prescribed minimum,
*309 Here, again, however, the court is confronted with the caveat of the Snell decision, in subtler form. Caution must be exercised not to rationalize a disagreement with the Secretary’s determination into an unlawful failure to accord the claimant the benefit of a reasonable doubt. For example, the testimony by plaintiff’s medical expert on the range within which reasonable men might reasonably differ as to the extent of plaintiff’s disability is persuasive, but not controlling in the light of the contrary opinion of defendant’s medical expert, although the present writer would accord greater weight to the testimony of Dr. Uhley on this point than to the testimony of Commander O’Connell.
The statute (Career Compensation Act of 1949) vests in the Secretary the responsibility for the final and controlling administrative determinations. Three courses are open to him. He may retire an officer, with retired pay, for a permanent disability of at least 30 percent; or he may place the officer’s name on the temporary disability retired list, with retired pay for a disability of at least 30 percent which may be of a permanent nature; or, if the disability is or may be of a permanent nature, but of a degree less than 30 percent, the Secretary may separate the officer with severance pay. From the foregoing it is apparent that the controlling decision, for the exercise of the Secretary’s alternative authorities, is the degree of the disability: is it “at least” 30 percent; or is it “less than” 30 percent.
While it has never been suggested that the Secretary’s determinations were or should be made in a vacuum, few cases coming before this court have so fully pointed up, as does this one, the advisory processes leading up to the crucial determination of the degree of disability: 30 percent on the line or above, or below the line.
As heretofore reported, plaintiff, while hospitalized in July 1955, appeared before a Clinical Board, which sent him to a Physical Evaluation Board. That Board found him suffering from a disability which “is or may be of a permanent nature” and rated it at 40 percent, “moderately severe.” The Physical Review Council lowered the rating to 20 percent, with which the Physical Disability Appeal Board *310 agreed. The Secretary accepted the recommendations of the Physical Review Council and the Appeal Board and made a determination of 20 percent, on the basis of which separation was ordered, with severance pay.
On the basis of plaintiff’s application to the Secretary for review of the determination, the Secretary went the whole way and sent plaintiff through the entire process de novo, starting in January 1956.
The same Clinical Board sent plaintiff to a de twvo Physical Evaluation Board, which heard his testimony and sent him back to the hospital for follow-up examinations 'before it recommended a finding of 40 percent disability, “moderately severe, with recurrent manifestations of impairment of health.” The Physical Review Council (whether or not it was de novo the evidence does not say), with the full record before it, found plaintiff fit for duty. The Physical Disability Appeal Board (de novo) declined to go along with the Physical Review Council and recommended a finding of disability rated at 20 percent, which the Secretary ultimately accepted in spite of the Physical Review Council’s renewed recommendation of a finding of fit for duty.
The recounting of this narrative in such condensed form lends emphasis to the elaboration of the system of checks and balances under which the decisional process unfolds. The procedure as a whole is impressive and in theory seems to leave little to be desired for the ultimate protection of the rights of the parties, the servicemen on the one hand and the Government on the other.
Insofar as there is a built-in conflict of interest, as between liberality toward unfortunate servicemen and fairness to the Federal Treasury, it is not too different from that which characterizes litigation in this court. Decisions have to be made and, whether they be administrative determinations or the judgments of courts, responsible officials can do no more than apply carefully designed standards to the decisional process.
In terms of the review by the Court of Claims of the Armed Forces’ administrative decisions in this field, it may well be that the court’s view is constricted by the fact that, of the administrative flow under the Career Compensation *311 Act, the court sees only a small fraction and this small portion, rather than representing a cross section of the administrative flow, almost uniformly presents individual dissatis-factions with the administrative determinations for their alleged lack of generosity, a lack deemed by the claimants to be so unfair as to be arbitrary or capricious.
Within a perspective so defined, the following observations are deemed warranted by the facts of the instant case.
Lawyers, who make the court reviews, are aware that in cases such as the present one, the administrative officers who made the initial decisions were themselves subject to guidance by physicians, members of a profession so learned as to require separate, specialized dictionaries to contain and expound its vocabulary. All laymen, lawyers, or administrators, must be wary of their conclusions in weighing medical testimony, lest they lose important nuances and wander as far afield as might a physician attempting a judgment on the Buie against Perpetuities.
Eather than attempt a firm decision on a close medical question that Doctor A was right and Doctor B was wrong, a layman to the profession tends to seek out and select the sounder of the two in terms of the overall appeal of his judgment, including the source of his information concerning the patient and his approach to diagnosis and appraisal. In the course of this process of selection nothing could be more natural than to accord greater weight to the opinions of the physicians who saw, heard, interviewed, and examined the patient than is given to the opinions of physicians who have reviewed a paper record only.
The disability of the plaintiff in the present case was evaluated by six Boards on which there were eight doctors, of whom only two ever saw, heard, interviewed, or examined plaintiff. Each of these two doctors was a member of a Physical Evaluation Board, and both Boards rated plaintiff’s disability at 40 percent, “moderately severe.”[30]
*312 In. the reviewing process the selectivity of judgments is further fortified by experience in the case of those of us who have a nostalgia for the old family physician of yesteryear. He was lacking, no doubt, in much of the esoteric expertise of today’s specialists, but he did know and consider the whole man.
The significant thrust of the Veterans Administration’s General Policy in Rating Disability is, in my opinion, toward evaluation in terms of the whole man.
* * * It is the responsibility of the rating specialist to interpret the reports of examination in the light of the whole recorded history, reconciling the various reports into a consistent picture, so that the current rating may accurately reflect the elements of permanent and temporary disability present. Each disability must be viewed from the point of view of the veteran working, or seeking work.
There have been cases in this court where the Armed Services’ rating boards appeared unwilling or unable to grasp the significance of this thrust. Cf. Smith, v. United States, 168 Ct. Cl. 545 (1964).
Moreover, in the instant case, the application of the reasonable doubt policy appears to have left something to be desired. Commander O’Connell addressed his testimony to the failure of plaintiff’s medical history to meet the requirements of the moderately severe rating. He found no “continuous manifestations of anemia, malnutrition and impairment of health.” The evidence as a whole sustains his judgment as to the absence of anemia. On the subject of malnutrition, the evidence likewise sustains his judgment if malnutrition is defined only in terms of wasting. If malnutrition is defined in terms of lack of energy from restricted diet, its application is not so clear. The second Physical Evaluation Board before which plaintiff appeared made a finding of “continuous manifestations of impairment of health.” With respect to that phrase therefore, there is a difference of opinion between Commander O’Connell, who never saw plaintiff, and the members of the Board who did see him.
Commander O’Connell defined incapacitation in terms of hospitalization or being bedridden. The weight of the evi *313 dence would accept episodic discomfort of a degree sufficient to destroy or seriously impair efficiency as incapacitation. Plaintiff repeatedly reported recurrent episodes averaging 7 to 10 days in duration and occurring several times a year. Commander O’Connell evidently found these reports unconvincing, since the “recurring incapacitating episodes averaging 10 days in duration and occurring several times a year” requirement is stated as an alternative to the “continuous manifestations of anemia, malnutrition and impairment of health,” and he could not qualify plaintiff’s disability as moderately severe under either alternative.
Even if Commander O’Connell’s views be accepted as a conservative judgment of the requirements for a rating of moderately severe, the application of the reasonable doubt policy is again called into question when the analysis takes up the next lower rating, “moderate.”
The moderate rating calls for “* * * recurring episodes of severe symptoms two or three times a year, averaging a week or more, with continuous moderate manifestations.” The evidence makes it abundantly clear that throughout the year 1955 and during the first 3 months of 1956, plaintiff had episodes of severe symptoms more than two or three times a year which averaged a week or more. Plaintiff contends that these facts should be weighed in terms of two statements in the General Policy, as follows:
* * * In view of the number of atypical instances, it is not expected, especially with the more fully described grades, that all cases will show all the findings speci-ed. * * * [and]
* * * If there is a reasonable doubt * * * as to which of two ratings shall be applied in any given case, the claimant is entitled to the higher.
The essence of the argument is that if, on balance, plaintiff’s disability should be deemed less than moderately severe but greater than moderate, there exists a reasonable doubt, which stated policy requires to be resolved in the claimant’s favor. In these terms it is a persuasive argument.
For a final observation, reference is made to the Note at the end of YA Code 7305:
* * * Ratings for postoperative adhesions, or psychoneurosis with predominantly gastric -fixation, are not *314 to Toe combined with the above ratings. [Emphasis supplied.]
Although there is no direct testimony on the point, the evidence as a whole supports an inference that this note played an important part in the assessments of the Physical Review Councils and the Physical Disability Appeal Boards because of recurrent references in the medical history intimating, if not overtly stating, that many of plaintiff’s symptoms were psychogenic in origin.
X
The facet of the instant case which sets it apart from the precedents that have come to my attention is the detailed evidence of the decisional process whereby the Secretary arrives at his administrative determinations. The crux of the present case lies in that decisional process.
When the Secretary of the Navy was requested by plaintiff to review or reconsider his initial determination (of November 1955) rating plaintiff’s disability at 20 percent and ordering his separation, the Secretary’s response, sending plaintiff to a de novo Physical Evaluation Board, was generous and humane. It reflected his will to arrive at a percentage rating representing as far as could practically be determined the impairment of plaintiff’s earning capacity, as required by the general policy in rating disability.
The de novo Physical Evaluation Board, after sending plaintiff back to the hospital, and after hearing his testimony and considering the report of Dr. Bockus, rated his disability at 40 percent, “moderately severe, with continuous manifestations of impairment of health.” The Physical Evaluation Board had the matter under consideration for 8 weeks before it submitted its recommendation.
Within 10 days thereafter, the Physical Review Council found plaintiff fit for duty, because the evidence of record indicated to it that his defect did not impair materially his ability to perform the duties of his office.
The determination that plaintiff was fit for duty was made by the Physical Review Council on the same evidence, presumably, that had persuaded two separate Physical Evaluation Boards to recommend a 40 percent rating, and on the *315 basis of which an earlier Physical Review Council and a Physical Disability Appeal Board had recommended ratings of 20 percent.
VA Code 7305 contains an ulcer rating of “mild; with recurring symptoms only once or twice a year,” evaluated at 10 percent. The Physical Review Council ignored this rating, to find plaintiff fit for duty.
There is no explanation in the evidence, other than is quoted hereinabove from the speed letter of advice to plaintiff, as to how the Physical Review Council arrived at its determination. One would infer from the language that the Council did not necessarily reject the ulcer diagnosis, but there is no direct evidence 'by which to confirm or refute the inference.
Plaintiff promptly filed his rebuttal with the Council, assuring it that he was “not feigning a disability,” and again reporting his symptoms and episodic experience.
The Physical Review Council took 1 week only to transmit the record to the Physical Disability Appeal Board, with advice that it adhered to its finding that plaintiff was fit for duty.
The Physical Disability Appeal Board declined to go along with the Physical Review Council on the fit-for-duty finding and recommended a 20 percent disability rating. The Board acted on May 25, 1956. Its recommendation was forwarded to the Physical Review Council for consideration and comment. Three weeks after its receipt of the Board’s recommendation, the Council forwarded the record to the Secretary with a final reaffirmation of its recommended finding of fit for duty.
The Secretary kept the matter under advisement 4 months before ultimately deciding to accept the recommendation of the Physical Disability Appeal Board in preference to that of the Physical Review Council.
Without specific facts to explain the Physical Review Council’s recommendation, efforts to appraise the reasoning upon which it was based or the motivation behind it would result only in speculation. The essential fact remains that the council’s determination of fit for duty is not only lacking in support by substantial evidence; it is unsupported by any *316 evidence whatever. The recommended finding must therefore be deemed to have been arbitrary, if not capricious.
The Physical Review Council was created, as hereinabove noted, for the express purpose of reviewing the record of proceedings of the Physical Evaluation Board in the light of established medical, legal, and personnel policies and to express its views thereon for the information of the Secretary. It is the central, key component of the decisional process. Attached to the Secretary’s office, it is his right arm in the rating of disabilities.
The instant case presents a graphic illustration of the confusion, if not downright mischief, infecting the decisional process as a result of arbitrary action by a Physical Review Council.
The reasonable doubt policy of the Veterans Administration Schedule is binding upon the Secretary himself, as well as the various boards comprising the decisional process. When the Physical Review Council, as the Secretary’s mainstay, submits an unrealistic, arbitrary recommendation, the proper application by the Secretary of the reasonable doubt policy is rendered unduly difficult if not impossible.
It is therefore my conclusion that, in the circumstances presented by the instant case, arbitrary action by the Physical Review Council compromised the decisional process and deprived it of the integrity to which the plaintiff was entitled. If this invalidity must be characterized by one of the terms in the reviewing formula — arbitrary, capricious, so grossly erroneous as to imply bad faith, unsupported by substantial evidence, or unlawful — I would select the word “arbitrary” to describe the 'Secretary’s final determination.[31]
XI
Decision by this court that the Secretary’s determination was invalid and cannot stand casts upon the court the responsibility for establishing a disability rating to take its place.
*317 In bis petition plaintiff asserts that he “* * * is entitled to the disability retirement pay of a lieutenant commander * * * with over 15 years of service and 50 per centum disability on the temporary disability retired list * * * for the period commencing November 30, 1956, and ending November 29, 1961, and the disability retirement pay of a lieutenant commander with his years of service and 40 per centum disability from and after November 30,1961,” to the date of judgment, “less appropriate off-sets, if any there be.”
The parties have since stipulated that as of November 29, 1956, plaintiff is credited with a total of 15 years of service for the purposes of retirement for physical disability.
Plaintiff’s claim for 50 percent of basic pay for the first 5 years after his separation is predicated on alleged entitlement to the benefits of the temporary disability retired list. The claim assumes that once on the list, no final determination of the percentage of disability would have been made until the very end of the time during which he might have remained on the list.
While the Secretary could have placed his name on the temporary disability retired list, the fact remains that he did not do so. Any possible advantages to either the plaintiff or the service, apparent in retrospect, from such action if it had been taken, are immaterial to the case in its present posture. An effort thus belatedly to realize upon such benefits would require the unscrambling of an omelet.
On the facts of record and as set forth in this opinion, plaintiff is deemed to have had a disability, on November 29, 1956, by reason of duodenal ulcer, ratable under the Veterans Administration Code 7305 at 40 percent, moderately severe. He is entitled to recover retirement pay on that basis, less the offset of his severance pay, the exact amount of his recovery to 'be determined in further proceedings pursuant to Eule 47(c).
FINDINGS or Fact
1. (a) Plaintiff[1] joined the Navy on May 15,1941, as an enlisted man. He was commissioned an ensign on February 4, 1942. By January 28, 1950, he had risen to the rank *318 of lieutenant commander. On that date he was released from active duty, but was recalled on October 14, 1950, and served until November 29, 1956, when he was separated from the service by reason of physical disability rated at 20 percent and awarded severance pay in the sum of $12,355.20.
(b) He filed this suit on July 25, 1962, seeking disability retirement pay from the date of his separation,[2] alleging that the failure of the Secretary of the Navy to rate his disability at 30 percent or more was arbitrary, capricious, unsupported by and contrary to the evidence, and unlawful.
(c) At the trial of the action,[3] plaintiff expanded his claim to include, in the alternative, active duty pay and allowances, from the date of separation, of an officer of his rank, length of service, and dependents, on the ground that his separation from the service was effected in violation of his rights under Navy regulations having the force and effect of law, wherefore the separation was void as a matter of law.
2. (a) Final determination of the percentage of disability at the time of separation from active service for military personnel eligible for disability retirement pay is vested in the Secretaries of the service departments.[4] Such questions are routed to the Secretary of the Navy through channels, as hereinafter described.[5]
(b) When the physical or mental condition of a serviceman (known in military board parlance as “party”) becomes *319 such as to place in doubt his fitness for further duty, he is examined by a Clinical Board[6] consisting of physicians in a hospital, who interview him, review his health records, record their observations and findings, and if, in their judgment, the question of his fitness is confirmed, recommend his appearance before a Physical Evaluation Board, to which the Clinical Board forwards its record.
(c) The Physical Evaluation Board consists of one medical officer and two nonmedical officers. It is constituted (1) to provide the party with a full and fair hearing (he may be represented by counsel) incident to evaluation of his fitness to perform the duties of his rank, grade, or rating; (2) to investigate the nature, cause, degree, and probable perma-nancy of any disabilities; and (3) to make recommended findings appropriate thereto, including a rating of the party’s disability.
(d) All recommended findings by a Physical Evaluation Board are transmitted to a Physical Review Council, constituted for the express purpose of reviewing the record of proceedings of the Physical Evaluation Board in the light of established medical, legal, and personnel policies and to express its views thereon for the information of the Secretary. The Physical Review Council consists of three members representing respectively the Judge Advocate General, the Bureau of Personnel, and the Bureau of Medicine and Surgery. It is not the function of the Physical Review Council to conduct hearings, and applications for personal appearances by parties are not entertained.
(e) Standing intermediately between the Physical Review Council and the Secretary is the Physical Disability Review (formerly “Appeal” Board, composed of five officers (two medical and three nonmedical members), and constituted to review the proceedings bef ore the Physical Evaluation Board in the light of action taken by the Physical Review Council, if the Council’s action differs from that of the Physical Evaluation Board.[7] The Physical Disability Review Board considers the contentions of the party, applies established medi *320 cal, legal, and personnel policies as appropriate, and expresses its views for the information of the Secretary. Before the report of the Physical Disability Review Board is transmitted to the Secretary, it first goes to the Physical Review Council, for concurrence or exception.
(f) The Physical Disability Review Board controls its own proceedings. It may, in its discretion, permit adversary proceedings before it, but the party cannot demand participation as a matter of right. If adversary proceedings are permitted, legal counsel for the party is furnished by the Judge Advocate General.[8] If the Board elects to restrict its review to the record, the party is permitted to present in writing any rebuttal he may have to the action of the Physical Review Council prior to consideration of his case by the Physical Disability Review Board.
(g) When the record of a party ultimately is transmitted by the Physical Review Counsel to the Secretary for his (final) determination, the Secretary may, and in the instant suit did, send the case back to another Physical Evaluation Board to have the whole process repeated, including a further examination by a Clinical (Medical) Board.
3. (a) The use of the Veterans’ Administration Schedule for Rating Disabilities is made mandatory by the Career Compensation Act of 1949, as amended.
(b) Following are excerpts from the Statement of General Policy in Rating Disability, in the VA Schedule:
1. Essentials of Emhiatwe Bating. — This rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations, of the various grades of severity as set forth with due regard to previous determinations for compensation or pension purposes. Generally, it may be said that the degrees of disability specified are considered adequate to compen *321 sate for considerable loss of working time from exacer-bations, or illnesses, proportionate to the severity of the several grades. For the application of the schedule, accurate and fully descriptive medical examinations are required, with the emphasis at all times upon the limitation of activity imposed by the disabling condition. * * *
2. Interpretation of Examination Reports. — It is the responsibility of the rating specialist to interpret the reports of examination in the light of the whole recorded history, reconciling the various reports into a consistent picture, so that the current rating may accurately reflect the elements of permanent and temporary disability present. Each disability must be viewed from the point of view of the veteran working, or seeking work.
3. Resolution of Reasonable Doubt. — It is the defined and consistently applied policy of the Veterans’ Administration to administer the law under a broad interpretation, consistent, however with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant.
By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind, that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete, record otherwise warrants invoking tins doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions and is consistent with the probable results of such known hardships.
‡ ‡ ^ $
6. Evaluation of Evidence.- — -The element of the weight to be accorded the character of the veteran’s serv *322 ice is but one factor entering into the considerations of the rating boards in arriving at determinations of the service connection and evaluation of disability. Every element in any way affecting the probative value to be assigned to the evidence in each individual claim must be thoroughly and conscientiously studied by each member of the rating board in the light of the established policies of the Veterans Administration to the end that decisions will be equitable and just as contemplated by the requirements of the law.
7. Higher of Two Ratings. — If there is a reasonable doubt, as above defined, as to which of two ratings shall be applied in any given case, the claimant is entitled to the higher.
* * * * *
10. Functional Impairment. — The basis of disability evaluations is the ability of the body as a whole, or of the psyche, or of a system or organ of the body, according to the general or localized effects of disease or injury to function under the circumstances of ordinary activity, that is, in daily life including employment. Thus, whether the upper or lower extremities, the back or abdominal wall, the eyes or ears, or the cardiovascular, digestive, or other system, or the mind, are affected, evaluations are based upon the usefulness, or lack of usefulness, of these parts or systems, especially in self support. This imposes upon the medical examiner the responsibility of furnishing, in addition to the etiological, anatomical, pathological, laboratory, and prognostic data required for ordinary medical classification, a full description of the effects of disability upon the person’s ordinary activity. In this connection it will be remembered that a person may be too ill, or weak, or otherwise disabled, to engage in work, although he is up and about and fairly comfortable at home or upon limited activity.
* * # * *
21. Application of Rating Schedule. — In view of the number of atypical instances it is not expected, especially with the more fully described grades, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances.
(c) Following is an excerpt from the VA Schedule for Eating Disabilities, concerning:
*323 The Digestive System
Peptic TJlcers. — Gastric and duodenal ulcers, from the standpoint of history and disability, are characterized by periodic recurrence of activity, with intervals of almost complete absence of physical signs and relief symptoms. During the recurrences, the principal symptom is epigastric pain, manifesting characteristic time relationship to ingestion of food, or hunger, with relief by alkalies, or by food (duodenal or marginal ulcers). With the onset of complications, such as obstruction or adhesions, the symptoms are more continuous and the periodicity and punctuality less striking. Acidity of gastric contents may be within normal limits. Following the original diagnosis the absence of signs and symptoms in the intervals between recurrences should not lead to change in diagnosis. Obstructive signs and symptoms are generally required for the higher ratings.
(d) Following is the Eating Schedule of Code 7305 for Ulcer, duodenal:

Diseases of the Digestive System

Code No. Rating

7305 Ulcer, duodenal * * *
Pronounced; with continuous symptoms; marked anemia, malnutrition, and impairment of health without periods of remission, totally incapacitating _ 100
Severe; with continuous manifestations of moderate anemia, with definite malnutrition and impairment of health, or frequently recurring hemorrhages with considerable loss of weight and anemia, or postoperative with definite partial obstruction shown by X-ray, and general impairment of health with frequent and prolonged episodes of vomiting_ 60
Moderately severe; with continuous manifestations of anemia, malnutrition and impairment of health, or with recurring incapacitating episodes averaging 10 days in duration and occurring several times a year_ 40
Moderate; with recurring episodes of severe symptoms two or three times a year averaging a week or more or with continuous moderate mani-festations_ 20
Mild; with recurring symptoms only once or twice a year_ 10
Latent; or postoperative, healed, without subsequent symptoms in past two years- 0
Note — Ratings for postoperative adhesions, or psy-ehoneurosis with predominately gastric fixation, are not to be combined with the above ratings.
*324 4. (a) When plaintiff joined the Navy, his health was good in all respects. His first appearance before a Physical Evaluation Board was on July 22, 1955, following examination by a Clinical Board a few days earlier. His separation, as heretofore noted, occurred November 29, 1956, by reason of physical disability rated at 20 percent resulting from “ulcer, duodenal,” rated under Code 7305 as “moderate.”
(’b) During the years intervening between 1941 and 1955, he was physically examined many times, and numerous entries from his health records are in evidence. Initially, he was found “physically qualified and temperamentally adapted for duty involving aviation training * * * [and] for duty involving actual control of aircraft * * *.” After he had acquired some experience as a pilot of aircraft, and as a commissioned officer, the standard entry read:
Found to be physically qualified and aeronautically adapted for duty involving actual control of aircraft and for performance of all duties of his rank at sea.
During the 14 years of 1941 through 1954, “physically qualified” entries of the type described in the preceding paragraph appear 6 times in 1941; twice (each) in 1942 and 1943; once (each) in 1944, 1945, 1947, and 1948; 4 times in 1950; once (each) in 1951, 1952, and 1953; and 3 times in 1954; for a total of 24 such entries. No such entries are in evidence for 1955 or 1956.
(c) During those 14 years (1941-1954), plaintiff had an operation for acute appendicitis in October 1942; was treated for a third-degree burn in December 1942; suffered a severe bout with fever[9] in the spring and summer of 1946; had a protracted siege of sinusitis during the spring and summer of 1949; was seen in the psychiatric outpatient clinic five times during September-October 1949;[10] was treated for cold, fever, and influenza in February-March 1951; was ex *325 amined for symptoms of arthritis in August 1953;[11] and had a return flare-up of sinusitis in November 1953.
(d) Plaintiff’s ulcer history began (of record) in March 1945, when he reported that he had begun to experience epigastric pain about a year earlier, with discomfort, excess gas in his stomach, and heartburn. As of March 1945, he reported some nausea and anorexia.[12] The pain was then fairly diffuse rather than sharply localized. The physician observed that plaintiff did “not appear to be acutely ill.” He was given a regimen of diet and medication which resulted in prompt relief of his distress. A fluoroscopic examination of the esophagus, stomach, and duodenum was negative. These findings were confirmed by serial radio-graphs “except for the presence of an elongated, rather tortuous shadow extending upward and mesially from the upper and medial border of the duodenal cap, seen in two films.”
A repetition of the GI series 4 days later resulted in findings : “fluoroscopic exam, negative; duodenum fills well and readily with the opaque meal, with no apparent spasm or filling defect”; findings confirmed by serial radiographs; “the shadow previously described as arising from the duodenal cap is believed to represent the second portion of the duodenum, and not a pathological condition. Impression: normal GI series. Diagnosis changed to hyperchlorhydria[13] * * * 5)
(e) One year later, in April 1946, plaintiff suffered a recurrence of the abdominal pain. He was given creamalin and the pain cleared. He had no nausea, vomiting, or diarrhea. A repeat GI series was negative.
In June 1949, while plaintiff was under treatment for sinusitis, he “insidiously” developed epigastric pain, nausea, and anorexia. Another regimen of diet and medication relieved his distress.
*326 (f) Almost 3 years passed before the next episode, in March 1952. On that occasion the medical findings were as follows:
* * * Fluoroscopy of chest with barium swallow revealed no inflammation. Following with barium meal the motility of the stomach was active and the outline of the fundus was normal. The duodenal bulb filled readily and emptied spontaneously. Films including spots of duodenum and four hours later reveal no evidence of active pathology. Imp[ression] : Essentially normal upper GI tract.
(g) After another year, in April 1954, the symptoms were more pronounced. Since his history “sounds as though it might be duodenal ulcer,” another GI series was performed, and again found to be negative. A repeat series made 1 month later, however, in May 1954, “revealed an ulcer crater of the duodenum.” When a strict diet for 1 week failed to give satisfactory relief of pain,” plaintiff was hospitalized with the diagnosis: “ulcer, duodenum (without obstruction).” The hospital record contains the following entry:
* * * The patient described his symptoms as dull, gnawing, or cramping epigastric distress of no predictable onset, but often occurring 1 y2 hours after meals, more often in the afternoons, and whenever he was tense or excited. The pain has tended to be cyclic in its occurrence — being aggravated for 7-10 days and then quiescent for 4-5 days. Self-induced vomiting, heavy cream and Amphojel has relieved the pain. * * * Follow-up GI series demonstrated gradual healing of the duodenal ulcer.
During the same period of hospitalization (June-July 1954) plaintiff was given a neuropsychiatric consultation “in conformity with patient’s own desires.” The report was: “Mild anxiety was evident, but there was not considered to be any manifest disability that would require therapy.”
In August 1954, 3 weeks after plaintiff’s release from the hospital, a reevaluation of the duodenal ulcer therapy was made, in consequence of which still another GI series was made, which “did not demonstrate any evidence of peptic ulcer,” although “following return to duty there was a gradual return of previously experienced symptoms which have slowly become more aggravated.”
*327 (h) Another episode in February 1955 was severe enough to send plaintiff back to the dispensary for further examination. Since his “epigastric distress [was] not completely relieved by ulcer” regimen, the examining physician ordered a gastroscopy, to “evaluate gastritis.” The gastroscopy was “normal,” wherefore the examiner reported that he did “not feel that this could be classified as gastritis.”
(i) Within less than 4 months (June 1955), plaintiff was again in the hospital for a full review and treatment. The hospital physicians reviewed and recorded his medical history in considerable detail. Excerpts follow:
Diagnosis: duodenal ulcer. * * * he was asymptomatic until 1945 when he first developed dull, gnawing epigastric discomfort which was of no definite periodicity but often appeared about 1% hours post-prandially. This mild epigastric pain more often appeared in the afternoon or when he was tense or excited. It also tended to be cyclic in its occurrence, with an aggravation of symptoms for 7-10 days followed by a quiescent period of 4 to 5 days. Soon after the onset of these symptoms a GI series was done and this was reported as negative. The patient was advised to drink milk between meals and on this dietary regimen there was a gradual relief of symptoms. He was asymptomatic until May 1946 when he again developed the same previously experienced gastro-intestinal symptoms. A GI series was done * * * at * * * San Diego * * *and this was reported as negative. From then on he had epigastric discomfort with recurrence at irregular intervals. In 1951 symptoms became more severe and again a GI series was done at * * * Chincoteague, Md., and again was reported as normal. Symptoms then gradually abated on a modified sippy regimen but in January 1954 epigastric distress once more became prominent and tended to persist. He was then seen at this * * * hospital [Philadelphia]. A GI series done on May 13, 1954 demonstrated an active duodenal ulcer. He was instructed as to diet and was also given Banthine and Phenobarbital. However, there was no dramatic improvement so he was admitted to this * * * hospital on 2 June 1954 with the diagnosis of ulcer, duodenum, NEC, without obstruction * * *. * * * A gradual healing of the duodenal ulcer was demonstrated by follow-up GI series. * * * He was discharged to duty on 23 July 1954. A follow-up GI series on 9 August 1954 did not demonstrate any evidence of peptic ulcer. *328 However, following return to duty there was a gradual return of previously experienced symptoms which have slowly become aggravated. * * * a gastroscopy completed on 9 March 1955 was normal. On this current admission to the sick list he was experiencing dull gnawing, occasionally sharp, epigastric pain * * *. * * * The pain has continued to be cyclic in its occurrence with periods of aggravated symptoms lasting 7 to 10 days and relatively quiescent periods lasting 4 to 5 days. * * * A GI series revealed minimum spasticity of the bulb but not [sic] definite ulcer crater was demonstrated. * * * The patient was also seen in neuro-psychiatric consultation. He was considered to have the type of personality consistent with ulcer disease. He did not demonstrate any evidence of psychotic, neurosis or character disorder. Psychotherapy was not considered to be indicated. The patient’s course was uneventful. There was a gradual amelioration of symptoms * * *.
[Three weeks later]: Diagnosis changed to: ulcer, duodenum, NEC, without obstruction * * *. Reason: Established. * * * At present the patient is asymptomatic; his condition is good. He has no limitations other than those imposed by the nature of the diagnosis with its tendency for recurrence. * * *
5. (a) On July 19, 1955, plaintiff appeared before a Clinical Board consisting, as above noted, of three medical officers.[14] This Board recommended that he appear before a Physical Evaluation Board. Attached to the recommendation was a copy of the hospital resume set forth in finding 4(i), immediately preceding.
(b) In transmitting its report to the Physical Evaluation Board, the Clinical Board certified (1) that plaintiff had appeared before the Clinical Board in person; (2) that he had been advised of the Clinical Board’s indicated disposition; (3) that he had been afforded an opportunity to submit a statement in rebuttal in writing; and (4) that his signed statement was attached. This statement is not in evidence.
6. (a) The Physical Evaluation Board, consisting of one medical officer[15] and two nonmedical officers,[16] received the *329 report of the Clinical Board on July 21, 1955 (including the medical history received the day before), held a hearing on July 22, and on the same day transmitted its report to the Physical Review Council.
(b) Plaintiff appeared in person before the Physical Evaluation Board and, upon stating that he desired counsel, a Navy lieutenant was assigned and took his seat as counsel for the evaluee. Upon further signifying that he desired to make a statement, plaintiff was sworn as a witness in his own behalf and was examined by his counsel.
(c) In response to questions by his own counsel, plaintiff testified:
(1) With respect to arthritis, that some 2 years earlier he started having pains in the joints of his left hand; that he was referred to a bone specialist who said he 'believed plaintiff had rheumatic arthritis in that hand, although the specialist could find no other symptoms; that a year passed during which plaintiff could not remember having pain in his left hand, but then the pain returned in his left hand and was currently in his right hand as well; that the joints were very sensitive, and he avoided shaking hands and had to be very careful about banging his knees against anything.
(2) With respect to the white corpuscles of his blood, that in the Bikini atom bomb test plaintiff flew closer than he intended to the atomic column; that his Geiger counter “went full scale — and hit the peg”; that about October (following the test in July) a routine check of personnel showed that his blood count had gone down, although he did not know how much; that while the doctor told him it had gone down considerably, it must have picked up on the next annual physical examination, since he heard no more about it.
(3) With respect to the ulcer, that he had no ulcer trouble before he entered the Navy; that currently he was in pain; that “since Monday” [he was testifying on Friday] he had had pain almost continuously every day; that this was “probably a typical week”; that the pain “increases and decreases in intensity and it isn’t at the same level all the time during the day”; that the episodes [of pain] normally “last about a week the shortest, and ten days the longest”; that “since this particularly sharp attack which really started in May” [he *330 was testifying in July], he had “been having only two days free * * * ten days ,[of pain] and then two days [free] and then ten days [of pain] ”; that back in the winter he had had 5 days free, changing the episodic pattern to 4 or 5 days of freedom from symptoms, followed by 7 to 10 days of pain; that he was on an ulcer diet consisting of milk, porridge, cream soup, and j ello; that while the doctor had not indicated anemia, he was required to drink 3 quarts of milk each day, alternating amphogel 1 hour with a glass of milk the next, during waking hours; that he felt nauseated “quite a bit of the time, * * * right now as a matter of fact,” and found it necessary to vomit quite often; that his condition was “a little hard on the family * * *,” and his wife had complained “about a change in my sense of humor and personality * * that when he was under one of these attacks, he guessed he was “a little hard to get along with”; that his fellow officers noticed the fact as well as his family ; and that in his opinion, he was unfit to perform the duties of his rank, “to do it right.”
(d) Pertinent portions of the “recommended findings” of the Physical Evaluation Board follow:
(1) That [evaluee] be found unfit to perform the duties of his rank by reason of physical disability incurred while entitled to receive basic pay by reason of:
(2) diagnosis. Ulcer, duodenum, n.e.c., without obstruction, Basic Diagnostic Nomenclature Code Number 5410, Joint Armed Forces Statistical Classification and Basic Diagnostic Nomenclature of Diseases and Injuries * * * 1949; that
(3) his disability is not due to intentional misconduct or willful neglect and was not incurred during a period of unauthorized absence; that
(4) he has completed at least 8 years of active service; that
(5) his disability is considered to be forty per centum in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Number 1305; Ulcer, Duodenal — moderately severe; that
(6) accepted medical principles indicate that his disability may be of a permanent nature.
(e) The foregoing recommended findings were announced in plaintiff’s presence; and he was advised that they did not *331 indicate what the final determination of the Secretary of the Navy would be and that they were communicated to him only for the purpose of filing a rebuttal if he so desired. There is no evidence to indicate that plaintiff filed such a rebuttal.
(f) On August 2, 1955, plaintiff was discharged from the hospital to temporary duty at the Philadelphia Naval Base to await the final action on the Physical Evaluation Board’s recommendation.[17]
7. (a) On September 8, 1955, there was transmitted to plaintiff the following naval speed letter:
The Physical Review Council is of the opinion and intends to recommend to the Secretary of the Navy that your disability is ratable at twenty (20) percent under VA Code 7305 in lieu of presently assigned rating. This because your degree of disability does not meet the criteria for the higher rating. It will further be recommended that you be separated from the service with severance pay.
You may within five (5) days submit statement in rebuttal. * * *
(b) On September 12, 1955, plaintiff presented his rebuttal in the form of a letter of approximately 1,000 words. Excerpts follow:
* * * * *
* * * A fact bearing on my case which was not explained before the Physical Evaluation Board is my nausea and vomiting. I asm unreasonably ashamed of my weakness in this matter and do not readily volunteer the details.
"Whenever I eat I am faced with the problem of whether the food will stay down or not. At present more than half my intake of food is vomited up after eating, either sooner or later. I am eating little solid food besides white bread and my principle [sic] item of diet, milk, stays down no better than anything else. This is such a problem that I never eat anything without having first located the nearest “head” where I can *332 vomit. The amount of nausea and the urgency of the vomiting varies. Sometimes I can swallow hard and hold it down. At other times, I retch and retph until my stomach feels absolutely empty. In the latter case, I have no control of the situation and it leaves me weak and shaking.
* * * The medicine Amphogel which I was required to take in the hospital markedly increased my nausea and I vomited nearly every day that I was there. (Vomiting has become such an integral part of my existence in the last two years that I seldom mention it anymore.) * * * I am faced with a frustrating dilemma, if I do not eat, my pain, and to a lesser extent, my hunger, will increase; if I do eat, I will probably get nauseated and vomit either immediately after eating or within the next several hours depending upon the pain and nausea. I face this dilemma about four times a day, at breakfast-time, at lunch-time, at dinner-time, and at bed-time.
* * * ' * *
I do not enjoy a role that smacks of invalidism and I take a great deal of pride in the fact that I always went to work. Often I have gone when I should have stayed away as far as actual accomplishment is concerned. When I have both pain and nausea my effectiveness is reduced almost to zero. * * *
I used to enjoy work (and still do when there is no pain or nausea) eat a normal balanced diet, * * *. Now I * * * have to get my work done in spite of pain and trips to the “head” or bathroom. I am very short with my co-workers, seem to have lost most of the “give” that makes normal human relations go smoothly. At afternoon and dinner-time I have pains and often have some unpleasantness at home.
Should the Physical Review Council fail to consider my appeal favorably, it is respectfully requested that this rebuttal and the record of the hearing before the Physical Evaluation Board be forwarded to the Physical Disability Appeal Board and in the interest of justice, if necessary, to the Secretary of the Navy.
(c) On September 23, 1955, the Physical Review Council transmitted the record (including the proceedings before the Physical Evaluation Board and copies of the Council’s speed letter to plaintiff and plaintiff’s letter of rebuttal to the Council) to the Physical Disability Appeal Board, with *333 advice that the Council, after considering the evaluee’s rebuttal, adhered to its decision to present to the Secretary its substitute finding of 20 percent disability.
8. (a) The Physical Disability Appeal Board[18] convened on October 26, 1955, to review plaintiff’s case. The Board decided that the presence of the evaluee was not necessary.[19] It reviewed the record transmitted to it by the Physical Review Council, including plaintiff’s rebuttal statement.
(b) The Board agreed with the Council in its concurrence with the recommended findings of the Physical Evaluation Board on all items except the rating of the degree of disability, as to which the Appeal Board agreed with the Council’s nonconcurrence and substitute finding of 20 percent. It therefore recommended to the Secretary of the Navy the approval of findings which concluded:
* * * That his disability is considered to be twenty (20) per centum * * * VA Code Number 7305 — Ulcer, Duodenal — moderate 20%.
0. (a) On November 9, 1955, the Acting Judge Advocate General of the Navy, in the name of the Secretary, noted approval of the action of the Physical Review Council and ordered that plaintiff be separated from the service by reason of physical disability “in conformity with” [cited] statutory provisions. This order was confirmed on November 29, 1955, when the date of plaintiff’s separation was fixed at December 9, 1955.
(b) On December 6, 1955, plaintiff’s request for a stay of execution of the foregoing order, pending review and reconsideration of his physical disability, was transmitted to the Secretary. The request was granted on December 9, 1955, to allow 30 days within which plaintiff might petition the Secretary for a review of the proceedings. The formal petition was forwarded under date of December 28, 1955.
(c) In his petition for review, plaintiff represented to the Secretary:
*334 * * * Since [29 November 1955] * * * I have consulted Dr. H. L. Bockus, a gastroenterologist * * * I have been under his care and observation since the 14th of December and have seen him once or twice a week every week since then. My last series of tests and examinations took up the whole of two days on December 20th and 21st. This was followed by a full morning of consultation with Dr. Bockus on the 27 th of December 1955. He has now placed me on the strictest dietary regime which I have ever been placed on. He expects to give me a report on this on January 4th, 1956.
Dr. Bockus has clearly indicated to me that I have a moderately severe ulcer condition and even at this time is ready to introduce evidence of my anemia, malnutrition and impairment of health. I am again willing to testify as to my condition. This involves not only recurring incapacitating episodes averaging ten days or more in duration and not only occurring several times a year, but occur many, many times a year. I have terrific pain, which I attribute [to] my conscientiousness in performing my navy duties.
* $ $ * $
(d) Dr. H. L. Bockus, of Philadelphia, was at that time a leading specialist in gastroenterology.[20]
(e) In response to plaintiff’s petition for a review (the exact time is not established by the evidence), the Secretary ordered that he appear again before a de novo Physical Evaluation Board.
10. On January 19,1956, Dr. Bockus transmitted to a medical officer at the Philadelphia Naval Base the following letter:
Thank you for sending Mr. Norman Cooper. I apologize for the delay in getting the letter off to you. There were a good many facets here that I thought ought to be carefully investigated before we definitely made up our minds. I wondered about the personality configuration, and the possibility of deep seated anxiety. You will recall that these present symptoms, according to the patient, have been present off and on for the past twelve years, and that they tend to come on an hour or two after meals, and tend to possess ulcer rhythm and periodicity. Prior to his coming here, he indicated that he had been having this distress for the previous month. *335 He indicated that a duodenal ulcer had previously been demonstrated.
I believe that he has been recently surveyed by a Navy-fitness board, and perhaps has been declared ineligible for duty. I am not too sure what role this may be playing in a total symptom configuration, and the interpretation of his subjective complaints.
He seemed a bit tense, but not unduely [sic] so, on physical examination. It is a little difficult to have him express himself freely. Nothing remarkable was found going over the head, nose, and throat. He points to a spot just to the right of the umbilicus as the location of the discomfort. He says there is a minimal degree of discomfort on that side on pressure, but there was no reactivity to indicate this. There was nothing to indicate any parietal tenderness or paraspinal tenderness. There was no tenderness in the midline of the epigastrium. No masses were felt. Rectal examination was negative.
I enclose a copy of the laboratory sheet. You will note that he was put through a rather complete survey. He shows about a grade i gastric acidity. We intubated his duodenum, visualized the tube tip in the duodenum, and removed material for cytologic study, and this has been reported negative. No crystals or pigment were found in the duodenal aspirate. You will note a normal blood count without eosinophilia. Nothing else significant in the workup. No evidence of hepatic or pancreatic dysfunction. No ova or parasites in two stool specimens. The agglutination tests are within the normal range.
I reviewed a great bundle of outside films. I could not make out any definite evidence of duodenal ulcer except for films exposed in June, 1955, where there is a marginal deformity quite characteristic of a duodenal fleck. The July and August films show no fleck. Dr. Widmann’s films show no duodenal ulcer fleck, but did show a subtraction defect about one centimeter in diameter on the external surface of the second part of the duodenum, just beyond the apex of the cap. This type of defect is occasionally caused by pericholicystic adhesion, periduodenitis, and anular pancreas, pancreatic rest, small benign tumor, or scarring from previous ulcer. We were a little intrigued by this, and went over all the old films, but in most instances, this segment of the duodenum was not well enough shown to decide whether or not it had been present previously. It was because of this defect that we did a duodenal intubation for Papenicolau stain, with negative results. While the *336 tube was in the duodenum, Dr. Widmann injected barium, and on this occasion, it was possible to iron out this subtraction defect, and cause it to disappear. We had Dr. Widmann visualize the gall bladder again, and then fill the stomach and duodenum. These films clearly indicate that there is no adhesion between the gall bladder or the duodenum, and nothing to suggest either pericholecystic or duodenal adhesions.
Discussion: I think we are left here with a person who is having episodically duodenal ulcer-like distress, and who, evidently in June of this year, did have a small duodenal ulcer. There is no striking cicatrix in the duodenum. There is no evidence of any other serious organic disease in the stomach, duodenal cap, or duodenal loop. I believe that the symptom configuration here is being influenced decidedly by a state of tension, and I believe there is some deep seated tensional factor which does not come to the surface, and I strongly suspect that it has a great deal to do with the symptom pattern. I suppose it is likely that the symptoms often are on a basis pyloroduodenal motor hyperactivity. I doubt very much if each time he has these symptoms, he has an active ulcer.
He was placed on a strict hourly feeding program, and this relieved his symptoms rather satisfactorily.
After he came back for the duodenal intubation studies, he evidently had developed this same distress for a few days, and going back on his program, he became symptom free again.
I have placed him now on a rather liberal, sensible diet, with between meals feedings, a copy of which you will find enclosed, and suggested to him that he ought to go back to the hourly feeding schedule, a copy of which you also will find enclosed, with gelusil and an antispasmotic antacid powder, and that this sort of program ought to be followed at all times, when he is having symptoms. I suspect that he will continue to have symptoms on a functional basis until his tensional situation is ironed out, whatever that may be.
11. (a) On January 31,1956, plaintiff appeared before another Physical Evaluation Board.[21] Plaintiff’s medical history had been received by the Board on January 23. Upon *337 plaintiff’s request for counsel, Lieutenant Lawrence E. Hess, Jr., USN, a member of tbe bar of tbe Supreme Court, took bis seat as counsel for tbe party. No evidence other than the record of prior proceedings was offered by the recorder. Pursuant to plaintiff’s request, be was sworn as a witness in his own behalf.
(b) In his testimony plaintiff reviewed his duty assignments up to the time of his hospitalization in June 1955,[22] repeated the substance of his prior testimony with respect to the atomic cloud incident at Bikini and with respect to arthritic symptoms, and spoke of his examination and treatment for ulcer by Dr. Bockus.[23] He also reviewed his bouts with ulcer pain and discomfort (including diet and medication) in some detail and in much the same terms as heretofore noted. He was then cross-examined at some length by the Board.
(c). After deliberating on the evidence, the Board reconvened (with all present), and the senior member announced that—
* * sufficient evidence is not yet available for the reaching of a decision. The new evidence at the present time is at best hearsay, and therefore the board is of the opinion that * * * the hearing should be adjourned until the specialist * * * would be available for appearance before the board, and also that he be readmitted to the hospital in view of the two additional items introduced in the party’s evidence, with particular attention to the evidence of any radiation effects and to the presence of arthritis and anemia. * * *
12. On March 6, 1956, the Clinical Board (consisting of the same members who comprised the initial Clinical Board) submitted the following Addendum to the Clinical Board report of July 19, 1955: [24]
This 36 year old LODE, USN was admitted to the hospital on 6 February 1956 by order of the Physical *338 Evaluation Board, * * * for additional studies referable to the gastro-intestinal system, hemapoietic system and bones and j oints.
This patient appeared before a clinical board on 19 July 1955 which recommended that he appear before a Physical Evaluation Board with the diagnosis of Ulcer Duodenum, without Obstruction, #5410. As a result of appeal the patient is now appearing before a De Novo Physical Evaluation Board.
Since his appearance before the Clinical Board the patient states that he has continued to have intermittent epigastric distress despite the fact that he is on a very bland diet consisting of strained foods, milk products, eggs and so forth without meat. He has continued to drink milk between meals since his discharge from the hospital. There has been no nausea or vomiting and the patient has not had melena. He further stated that he had had mild pains and aches in both hands and knees intermittently since last July.
Physical examination on admission was within normal limits.
Urinalysis, serology, complete blood count, sedimentation rate, were within normal limits. Stools for occult blood showed a plus reaction. X-ray examination of the upper GI tract by means of Ba Meal was within normal limits. Barium enema revealed a normal colon. Gall bladder study revealed a normal functioning gall blad-. der without evidence of calculi. X-ray examination of the hands, knees, wrists and elbows were negative.
Examination of the bone marrow and peripheral blood smear performed by an M.D. hematologist, were within normal limits. Orthopedic consultant stated “I do not find any significant degree of orthopedic abnormality at the moment by Physical examination or revealed in the history. Although a very minimal degenerative arthritis cannot be denied on subjective complaints alone, this is not confirmed by X-ray or physical examination.” * * * An attempt was made to gastroscope the patient but this was unsuccessful because of lack of cooperation on the patient’s part and not felt by the operator to be due to lack of anesthesia. _
_ At the present time the patient is taking an extremely bland diet consisting of milk products, eggs, cereals, strained and chopped vegetables and creamed soups. He states that the ingestion of meat products causes him to have ulcer type pain in the epigastrium.
*339 13. (a) On March 27, 1956, the matter again came before the Physical Evaluation Board.[25] Lieutenant Hess was again assigned as counsel for the evaluee. Plaintiff again took the stand in his own behalf. His counsel further stated that Dr. Bockus, if present, would testify substantially as in his letter of January 19 (finding 10).
(b) Plaintiff again reviewed his ulcer condition, saying:
* * * there really isn’t any pattern to it. * * * During one of these long episodes of seven, eight, nine or ten days, I sometimes vomit only once or twice, and sometimes there are two or three days when everything I eat comes up * * *. So it goes from mild to what I consider severe vomiting.
He further testified that during the current winter he had experienced about 5 days [free of symptoms] followed by episodes lasting 10 days.
(c) Plaintiff’s counsel concluded his summation before the Board with a request that plaintiff be placed on the temporary disability retired list.[26]
(d) After deliberating on the evidence, the Board recommended substantially the same findings as had been recommended by the Physical Evaluation Board of July 1955, including the finding that—
* * * his disability is considered to be forty per centum * * * VA Code * * * 7305; Ulcer, Duodenum, *340 moderately severe, with continuous manifestations of impairment of health.
14. (a) On April 5, 1956, a Physical Review Council[27] forwarded to plaintiff the following naval speed letter:
The Physical Review Council is of the opinion and intends to recommend to the Secretary of the Navy that you are fit for duty. This because the evidence of record indicates that your defect does not impair materially your ability to perform the duties of your rank.
You may within five (5) days submit statement in rebuttal.
(b) On April 23, 1956, plaintiff submitted his rebuttal in another letter of some 1,500 words. Excerpts follow:
* * * The latest action of the Physical Review Council was to find me fit for duty in its opinion, * * *. This is a rebuttal to that opinion. Throughout the almost entire year of these proceedings I have had continuous pain and suffering from my stomach. I have had nausea, vomiting and loss of sleep. My diet has been highly restricted. It has basically consisted of milk and crackers and associated soft foods. I have continuous days of pain or spells of pain existing for ten days or so, with only two or three days relief before I get into another episode of the same duration. In other words, it is ten days of pain, three days off, ten days of pain, three days off, ad infinitum. Rarely I may have a little more than three days of freedom from pain, but this is the exception rather than the rule.
I have extreme difficulty in trying to perform my duties. I’ve served on active duty almost fifteen years. This pain and nausea greatly decreases my efficiency and also results in strained relations with those who have to work for me. I usually am able to find a suitable place to deposit any vomiting I have, but occasionally accidents happen in which I am unable to get to a head. My restricted diet is another source of great concern.
* * * Since the latest action of the Physical Review Council I was again x-rayed and reexamined by Dr. B. P. Wicbnann, MD, * * * on April 20, 1956. He again confirmed my diagnosis as an irritable duodenal bulb with duodenal ulceration. * * * In summary he stated
*341 I bad an active Duodenal Ulcer. His report is enclosed * * * and tbe x-rays be used, consisting of one large x-ray and nine smaller pictures, are herewith enclosed * * *.
The * * * report of Dr. W. P. Widmann * * * follows:
“A re-examination of the Stomach and Duodenum:
“Chest: Fluoroscopically normal.
Diaphragm, Mediastinum and 'Heart Configurations: Average normal.
Esophagus: Negative to liquids.
Stomach: ‘Fish-hook’ type. Prepyloric irritability. There is no demonstrable niche defect or deformity or ulcer or carcinoma. .
Duodenal Bulb: Irritable. There is a persistent, minimal deformity, considered to represent combined effects of scarring and spasm in relation to recurrent, active, duodenal ulceration. In concomitant films, there is a small ulcer fleck on the greater curvature and apex area.
Duodenal Loop: Shows no displacement.
4 Hour Study': Stomach is empty. Terminal ileum and immediate ileocecal juncture normal. Head of the barium column has normally reached the left half of colon.

“Summary:

“1. Eecurrent, non-obstructing, active, duodenal ulcer.”

Summary

* * * three out of four boards have found me disabled. Two Physical Evaluation Boards have found me disabled to the extent of 40% disability. The Physical Review Council itself previously found me disabled to the extent of 20% disability. Its present finding of finding me fit for duty is completely incongruous.
* * * I am not one to ask something for nothing. I have never considered myself a gold brick and have never been one. I am not feigning a disability. My own doctors have confirmed the Navy doctors diagnosis. It is all here in black and white. There is no conflict between the Navy doctors and civilian doctors in my case. The evidence is all one way.
* * * I respectfully request that I be placed on the physical disability retired list.
I do not know how I could get a job in civilian life let alone try to continue my position in the Navy. * * *
Should the Physical Review Council fail to consider this rebuttal favorably, I respectfully request that it be *342 forwarded with my records, and the enclosed report of Dr. Widmann and the x-ray pictures, to the Physical Disability Appeal Board for its consideration.
(c) On April 30,1956, the Physical Review Council transmitted to the Physical Disability Appeal Board the record of the proceedings before the [second] Physical Evaluation Board and copies of its speed letter of April 5, 1956, and plaintiff’s letter of rebuttal of April 23,1956, with the advice that the Council adhered to its decision and intended to recommend to the Secretary a finding that plaintiff was fit for duty.
15. (a) On May 25, 1956, the Physical Disability Appeal Board[28] convened, decided that the presence of the evaluee was not necessary,[29] and reviewed “the record of proceedings of the Physical Evaluation Board and the action of the Physical Review Council thereon, together with all documents transmitted to it in the case of the party * * *.”
(b) “After careful deliberation of all the evidence before it,” the Physical Disability Appeal Board submitted “the following advisory opinion to the Secretary of the Navy”:
That the proposed substitute finding of the Physical Review Council to the recommended findings of the Physical Evaluation Board * * * should not be approved ; that the recommended findings of the Physical Evaluation Board * * * should be approved with the exception of Item 5, for which the following substitution is recommended:
That the party’s disability should be rated at 20% in lieu of the 40% rating recommended by the Physical Evaluation Board as his disability is moderate and meets the criteria of the 20% rating under Veterans Administration Code #7305.
(c) On June 6,1956, the record of the proceedings before the Physical Disability Appeal Board was transmitted by the Judge Advocate General to the Physical Review Council “for further consideration, comment, as appropriate, and return to the Secretary of the Navy.”
*343 (d) On July 2, 1956, the Physical Review Council transmitted the record to the Secretary of the Navy with advice that the Council adhered to its recommended finding of fit for duty.
(e) On October 15, 1956, the Secretary of the Navy advised the Judge Advocate General of his desire to approve the recommendations of the Physical Disability Appeal Board (20 percent disability).
(f) On October 22, 1956, the Assistant Judge Advocate of the Navy, “by direction of the Secretary * * issued a directive whereby (1) one “party” was permanently retired for (total) physical disability; (2) 14 men were placed on the temporary disability retired list;[30] and (3) 6 men (plaintiff among them) were “to be separated from the naval service by reason of physical disability in conformity with” statutory provisions.[31]
16. (a) On November 28, 1956, by order of the Commandant, Fourth Naval District, plaintiff was (as of 29 November 1956) detached from temporary duty and given an honorable discharge “by reason of physical disabilty.” [32]
(b) The foregoing order specified:
Physical examination incident to separation not required in accordance with Article C-10412, BuPers Manual.[33]
(c) Plaintiff testified at the trial that 1956 was a rough year for him; that he suffered some 20 to 30 episodes of ulcer pain and other symptoms, being symptom-free only about *344 one-fourth of the time; that he was constantly on medication ; but that he did not seek hospitalization or medical care during the period between March 27, 1956, and the date of his release (November 29) because he felt that, having had ulcer pains for some 10 or 11 years, he was going to have them for the rest of his life and that he had to learn to live with the situation.[34] He further testified that during this period he had major attacks in June and again in the fall, placing him within a recognized pattern of spring-fall recurrences.
(d) Plaintiff was not seen by a medical officer of the Navy after March 27, 1956. He was given no separation physical examination. He did not ask for one; neither did he allege that his physical condition had changed materially since his last appearance before a Physical Evaluation Board.
(e) Plaintiff’s separation order was, as heretofore noted,[35] predicated upon the approval by the Secretary of the recommendation of the second Physical Disability Appeal Board. That recommendation was predicated, in turn, upon the report of the second Physical Evaluation Board, except as to the degree of disability, as to which the Appeal Board followed neither of the Physical Evaluation Boards (40 percent disability) or the second Physical Review Council (fit for duty) but recommended a finding of 20 percent disability (which was in accord with the recommendation of the first Physical Review Council).
17. (a) In January 1958, plaintiff applied to the Veterans Administration for disability compensation. The VA obtained from Dr. Widmann the X-ray films and report made by Dr. Widmann in April 1956[36] (after. Dr. Widmann’s work with Dr. Bockus); a copy of Dr. Bockus’ report;[37] and a report from Dr. Lyman Harrison,[38] under whose care plain *345 tiff then was. Before its rating award was made, the VA also obtained the record of the proceedings of the second Physical Evaluation Board.
(b) On the basis of plaintiff’s complaint to the VA that he thought he had ulcers of the stomach and that he also had feelings of depression, the VA conducted two examinations, one physical and one psychiatric.
(c) The physical examination by the VA was directed toward his report of sinusitis as well as the ulcer condition. Nothing new or dramatic was developed in either direction.
(d) Following are excerpts from the VA clinical record of the psychiatric examination:
* * * The patient is neatly dressed and well groomed. He impresses the examiner in a rather peculiar, bizarre manner. At times he will sit quietly absorbed in some inner-thought, will not speak for about 2 or 3 minutes even if a question is put to him directly. He then apologizes and speaks in a pleasant, congenial manner. Patient does not volunteer any NP complaints, and when asked directly, he denies any nervousness or any need of psychiatric assistance or psychotherapy. However, at the same time he admits that he is under the care of a Psychiatrist whom he calls an “analyst”. Patient then states that his chief difficulty is that he cannot make up his mind what he wants to do, and that he feels hopeless and “useless”. * * * The patient denies that anybody is against him, or that he is being mistreated by anybody. He hears no voices and he has no visual hallucinations. He worries somewhat about his ulcers that he claims he has, but otherwise doesn’t think that he has a fatal disease.
The patient is definitely psychotic. He has a psychotic depressive reaction * * *.
Diagnosis: Psychotic Depressive Beaction, Competent.
(e) On July 9, 1958, the VA awarded to plaintiff disability compensation based upon a 20 percent degree of dis *346 ability, for his ulcer condition,[39] and denied awards for other physical handicaps as not shown to be disabling and for “psychotic depressive reaction” as “not service incurred or aggravated.”
18. Following his release from the Navy, plaintiff spent some time with his family in Winchester, Virginia, where he made some (unsuccessful) efforts to obtain employment. Early in 1957, he went to work for Biddle Air Lines, of Macon, Georgia, as a co-pilot. He resigned from this position on June 1, 1957, principally because of his continuing ulcer problem. Beginning in January 1958, he worked as a salesman for different companies, but none of the positions lasted more than 4 months. Sometime during 1958, he returned to California. In 1960 he became sexton of a church in Arcadia, California, and was so employed at the time of trial (January 1964).
19. (a) Two trial sessions were held in this case: one in Los Angeles, in January 1964, for the testimony of plaintiff and his medical expert; and one in Washington, in September 1964, for the testimony of defendant’s medical expert.
(b) Plaintiff testified, in substance, that since 1956 his ulcer condition had continued, and that either it had grown progressively worse or he was being worn down by it. Otherwise, facts warranted by his testimony are contained in preceding findings.
(c) Plaintiff’s medical expert was Hr. Milton H. Uhley, a physician residing in Beverly Hills, California, specializing in internal medicine and cardiology, who had also done some research in gastroenterology. Hr. Uhley had first examined plaintiff on June 25, 1958, and had treated him intermittently from that date through 1963.
(d) Hefendant’s medical expert was Commander Fred H. O’Connell, USN, a specialist in internal medicine including the diagnosis and treatment of gastrointestinal diseases. He had never examined (or seen) the plaintiff. In September 1964, Commander O’Connell was on active duty with the *347 Navy, engaged in activities of tie Management Bureau, Bureau of Medicine and Surgery, assigned specifically to tie Legal Medicine Branch, and to the Division of Physical Qualifications and Becords. He was likewise serving as an alternate member of the Physical Beview Council. He had served as a member of a Clinical Board but never as a member of a Physical Evaluation Board.
(e) Inasmuch as the testimony of these two medical experts has proved useful in the weighing of evidence in this case, their testimony is summarized in the findings immediately following.
20. (a) In 1954, an article by Dr. Uhley was published in the American Journal of Digestive Diseases under the title: “Observations on a Method for Suspecting the Presence of Active Duodenal Ulcer by Physical Examination.” Excerpts from the article, pertinent to the instant case, follow:
The attitude of the physician in 1910 toward the diagnosis of peptic ulcer was summarized by the following quotation from the writing of Moynihan * * *: “The symptoms so perfectly characteristic of duodenal ulcer may be present for years without producing any physical signs. It is, therefore, not necessary to the attaining of an accurate diagnosis that any physical examination of the patient be made. The anamnesis is everything, the physical examination relatively nothing.”
*****
The diagnosis, it is true, may readily be suspected when the history is “classical,” but such histories are quite uncommon. There are remarkable variations in perceptiveness of subjective phenomena. The inability to formulate subjective experiences into verbalizations may prevent adequate commwnication with the physician. Pain thresholds vary considerably. Patients may minimize or deny the existence of symptoms to serve particular psychic needs. * * * [Emphasis supplied.] The physical examination, in light of observations here to be reported, has proven to be of inestimable value in suspecting the presence of active peptic ulcer, regardless of the patient’s history.
* * * * if:
The dictum, since the turn of the century, that the existence of the peptic ulcer stale ccm be surmised only from the history, and that the physical examination is *348 relatively mimportant, is questioned in this study. * * * [Emphasis supplied.]
(b) Dr. Uhley expressed the opinion that plaintiff, in 1958, was “quite ill.” Although X-rays made at that time did not show a demonstrable ulcer crater, this fact was deemed relatively unimportant. (Later X-rays, made in 1962, did indicate a crater.) Dr. Uhley preferred to express his diagnosis in terms of “a syndrome defined as the peptic ulcer state.” [40]
(c) Pain, Dr. Uhley testified, may be a major symptom of duodenal ulcer, but is not necessarily an important element in the picture. Moreover, he indicated, the reporting of pain by a patient involves communication, and some patients have a higher tolerance of pain than others. He characterized plaintiff’s tolerance as “inordinately high.” [41]
(d) While on the witness stand, Dr. Uhley was shown the report by Dr. Bockus (finding 10) for the first time. After reading that report, Dr. Uhley said: “I agree with Dr. Bockus’ statement, because I think he is saying the same thing I am.” [42]
(e) After Dr. Uhley was shown an extract from the VA Code pertaining to ulcer (No. 7305), he expressed the opinion that, in 1956 as well as 1958, plaintiff’s incapacitation was moderately severe to severe. He agreed, on cross-examination, that equally qualified doctors could disagree on the degree of severity, as between moderately severe and severe, or between severe and total incapacitation, but said it was “incomprehensible * * * for a patient presenting symptoms of *349 persistent bouts of vomiting and persistent presence of epi-gastric pain to be considered mild.” [43]
21. (a) Although Commander O’Connell never personally examined plaintiff, he did, at the request of defense counsel, review plaintiff’s complete medical file and the various reports by private physicians that are now in evidence. He agreed that equally qualified doctors could disagree on the degree of disability but, in his opinion, the range wherein qualified doctors might reasonably differ in plaintiff’s case was limited to the difference between “mild” and “moderate.” It was his opinion that plaintiff’s medical record would not, under any circumstances, support a rating higher than “moderate” when tested by the criteria listed in the VA rating schedule.
(b) Queried as to how, on the basis of the medical evidence of record, he would account for the disparity of the conclusions of the various boards (since two PEBs made findings of 40 percent; one PEC found 20 percent; one found fit for duty; and two PDABs found 20 percent), Commander O’Connell indicated that, from the standpoint of the Physical Eeview Councils, the findings of Physical Evaluation Boards are often downgraded because (1) the one medical officer on the Physical Evaluation Board is in a position, as a medical expert, to impose his judgment on his two nonmedical fellow members; (2) the medical officer himself may be performing out of his specialty (as, for example, if the medical officer on plaintiff’s Physical Evaluation Board had been an orthopedist or a genitourinary specialist); and (3) it usually takes a while for the medical officer on a Physical Evaluation Board to learn that he must abide by the terms of the VA schedule in rating disabilities.
He further indicated his belief that ratings based on objective reviews of written records, by medical officers who never saw or examined the evaluee, were generally more reliable than ratings made on the basis of personal examinations, interviews, and observations.
*350 (c) Based upon his own review of the medical record of plaintiff, Commander O’Connell testified that as of .April 1956 he would have rated plaintiff’s disability at 10 or 20 percent. His explanation for giving plaintiff the benefit of the doubt (for a 20 percent rating) follows:
* * * I see the patient’s history gone over and how he has done in the last year, and still there is no problem with physical wasting; laboratory studies show no anemia; he has not been, for medical reasons because of incapacitation, confined to the hospital, or suddenly rushed in because this lesion is now scarring and closing off the bowel; he has not been bleeding; he has not blown a hole in the thing; in spite of all the trouble he has which is so hard to pin down, the loss of sense of well being in various ways, he still hasn’t produced anything of severity by my own standards, as I have named some of these things, or by the standards of the YA; in fact his story changes even from time to time, and I am becoming more and more aware of the fact that his personality makes contribution to his appreciation of his pain, depending on how he feels. I wonder — at some times and in some moods he describes his disease optimistically and at other times he describes it quite pessimistically. But the reason I say, oh, okay 20, is because let’s assume that he has pain, or he has, as they say, severe symptoms recurring two or three times a year or more, you know, let’s assume, as I said before, about that veracity; he has it often, more than two or three times a year or more, so let’s give 20 for the sake of benefit of the doubt to make sure we have got him covered. I certainly am not going to give him 40 when the things named above, the more objective things, are not demonstrated at all in his records.
(d) Commander O’Connell’s testimony amplified the foregoing in terms of the rating schedule requirements for “moderately severe.” Based upon the reports of plaintiff’s physical examinations, the Commander found no “continuous manifestations of anemia,” or “of malnutrition and impairment of health”; and no “recurring incapacitating episodes averaging 10 days in duration and occurring several times a year.” Incapacitating, medically speaking, he said meant “bed-ridden, hospitalized or that an individual is unable to do the ordinary social domestic or official things for a man of his state.”
*351 RECAPITULATION
22. (a) When plaintiff testified at the trial of this case, in January 1964, he appeared to be what the medical fraternity would describe as “a well-nourished male.” He was then 44 years of age. Impressions gained from his appearance at that time were superficial. He was suffering, physically, from the ulcer condition, and was handicapped mentally by a condition known as psychotic depressive reaction.
(b) The ulcer condition was service-connected; the mental condition was not.[44] Since his separation, the ulcer condition, as he testified, had either grown worse, or he had been worn down by it. His mental condition had deteriorated since his release.
(c) It is not established by the evidence that at the time of his separation from the Navy plaintiff was suffering from any disability, physical or mental, ratable under the YA Code, except that of duodenal (peptic) ulcer.
23. The parties have stipulated that “on November 29, 1956, plaintiff had completed a total of 15 years, 7 months, and 6 days of service creditable for the purpose of computing his basic pay. For the purpose of retirement for physical disability plaintiff is credited with a total of 15 years of service as of November 29, 1956.”
24. (a) At the time of his separation, the diagnosis of plaintiff’s ulcer condition was established as: ulcer, duodenum, NEC, without obstruction.
(b) Considering the evidence as a whole (including plaintiff’s testimony before and representations to the various rating boards and the testimony of medical experts) the conclusion is warranted that plaintiff’s disability resulting from the ulcer condition was greater than that described in YA Code 1305 as “moderate.” [45]
(c) By the same measure (considering the evidence as a *352 whole) the conclusion is warranted that plaintiff’s ulcer condition was properly classifiable under VA Code 7305 as “moderately severe,” in that during 1955 and 1956 there were “recurring incapacitating episodes averaging 10 days in duration and occurring several times a year.” [46]
(d) There is no evidence to support the determination by the second Physical Eeview Council that, in and after April 1956, plaintiff was fit for duty.
(e) At the time of plaintiff’s physical examination by the Veterans Administration, in 1958, plaintiff’s mental Outlook was such that he may well have failed, as he contends, in his articulation to the VA doctors of his ulcer symptoms.
25. (a) The determination by the second Physical Review Council that in and after April 1956 plaintiff was fit for duty, 'being wholly unsupported by evidence, was arbitrary, and perhaps capricious.
(b) The injection into the decisional process of the Secretary of the arbitrary determination by the second Physical Review Council compromised the decisional process and deprived it of its integrity.
(c) As a consequence, the final determination by the Secretary must be deemed lacking in the conscientious application of the decisional process, including the mandatory policy pertaining to reasonable doubt, and therefore arbitrary and invalid.
CONCLUSION OE Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover disability retirement pay, computed on the basis of a disability rating of 40 per centum, from the day following the day of his release from active duty, less the amount received as severance pay at the time of his separation, and judgment is entered to that effect. The amount of recovery will be determined in further proceedings pursuant to Rule 47 (c).
*353 In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 31, 1967, that judgment for the plaintiff be entered for $14,602.09.

 The opinion, findings of fact, and recommended conclusion of law are submitted pursuant to the order of reference and Rule 57(a).

 10 U.S.C. §§ 1201-1221.

 10 U.S.C. 8 1201.

 10 U.S.C. § 1202.

 10 U.S.C. § 1203.

 Chapter IX, sections 0900-0962.

 By a letter of November 7, 1966, the Department of the Navy has reaffirmed, at the request of the court, that the consistent interpretation of the regulation was as Commissioner Evans found it to be [footnote by the court].

 The attorney for plaintiff, in his brief, has made a persuasive case for the advisability (as distinguished from necessity or requirement) of counsel to represent the evaluee in the circumstances of the instant claim, in terms of “the benefits available from, and the prejudice possible on denial of, the assistance of counsel * * If plaintiff had had counsel before the second Physical Disability Appeal Board, it is quite possible that the outcome might have been altered in his favor. It does not follow, however, that the failure of the Board to appoint counsel resulted in the denial to plaintiff of “a positive right.”

 Here, again, the facts indicate that a separation physical might have altered the outcome of the case in plaintiff’s favor. He was last seen by a Navy medical officer in March 1956, 8 months prior to his separation in November. During those months, according to plaintiff’s testimony at the trial, he suffered continual, prolonged episodes of ulcer symptoms, with intermittent but brief periods of freedom from symptoms. Such a record, if officially inserted in his health records, would have gone far to substantiate a rating of “moderately severe” to “severe.” Absent the separation physical, this experience never appeared in the official records.

 When plaintiff appeared before the second Physical Evaluation Board, he raised the question of arthritis and of blood count damage by reason of having once flown too close to an atomic cloud. The Board ordered his hospitalization for further examination of both of these possibilities, but all objective tests were negative.

 P. 563.

 Id.

 144 Ct. Cl. 492, 496 (1959).

 The parties have stipulated that “on November 29, 1956, plaintiff had completed a total of 15 years, 7 months, and 6 days of service creditable for the purpose of computing his basic pay. Eor the purpose of retirement for physical disability plaintiff is credited with a total of 15 years of service as of November 29, 1956.”

 Various diagnoses were made of this condition: catarrhal fever; cause undetermined; undulant fever; cause undetermined (when “discharged to duty; fit for same”).

 This health record contains the following entry: “* * * There were no indications of any malignant psychopathological findings and the impression was that this officer is a very passive-dependent character * *

 In response to inquiry from the dispensary where plaintiff was examined, Internal Medicine replied: “From history and physical exam I cannot explain this officer’s symptoms. It does seem that his pain comes when he moves a joint into extreme position * * *. My opinion is that no disease exists * *

 Each or loss of the appetite for food.

 Excessive secretion of hydrochloric acid by the stomach cells.

 The members were: Commander A. R. Errlon, Commander J. S. Cowan, and Lieutenant R. P. Smitley, all of the Medical Corps. Commander Errlon conducted the examination.

 The significance of this fact rests upon the emphasis given to it by the testimony of defendant’s medical expert, as summarized hereinafter.

 These members were: from the Medical Corps, Captain Henry G. Bull-winkel, USN, and Commander Rees Morgan, USN; nonmedieal, Captain Robert L. Morris, USN, Commander John L. Slade, TJSNR, and Commander Elmo H. Hutchison, TJSNR.

 The members of the second Physical Evaluation Board were: Captain Lynn S. Beals, Jr., Medical Corps, USN; Commander William N. Vlachos, USNK; and Lieutenant Commander Arnold Brandt, USNK.

 The full test of the letter Is set forth In finding 10.

 As noted at the outset of this opinion, the Secretary may place an officer’s name on the temporary disability retired list, with retired pay [which by statute is 50 percent of basic pay],, upon a determination that the officer would be qualified for retirement except for the fact that his disability is not determined to be, but may be, of a permanent nature, if the Secretary further determines the disability to be at least 30 percent.

 While the membership of the first PEC is not identified by the evidence, the members of the second PRC were: Captain Rodman D. Smith, USN (Personnel) ; Captain Byron D. Casteel, USN (Medical) ; and Commander Carl P. Paul, Jr., USNE (Judge Advocate General).

 Dr. Widmann’s report is in evidence. It says, in “Summary: * * * Recurrent, non-obstructing, active, duodenal ulcer.”

 The members of tbe 1956 PDAB (with retentions from tbe 1955 Board underscored) were: Captain C. L. Denton, USN (Medical)i; Captain C. E. Smith, USNR; Captain M. L. McCullough, Jr., USN; Captain R. Morgan, USN (Medical) : and Commander J. L. Slade, USNR.

 Excerpts from Dr. Harrison’s report follow: “This patient has had periodic bouts of proven ‘stomach ulcer’ for approximately 15 years. * * * My impression is that the condition is psychogenic in origin. He has a moderately rigid passive-aggressive personality and character structure, which does not allow for outward expression of anger and resentment. * * * In addition, there are certain obsessive-compulsive features in Mr. Cooper’s rigid approach * * Dr. Harrison recommended psychiatric treatment and reported that he himself was treating plaintiff “pro tern * * * in psychotherapy * *

 under this award the disability compensation was §36 per month, “subject to the recoupment of severance pay in the sum of $12,355.20 * * Something over 26 years would be required for the recoupment.

 Defendant now urges this determination by the Veterans Administration as persuasive evidence of the accuracy and fairness of the official determination by the Secretary. Andrews v. United States, supra. Plaintiff’s response is that at the time of the VA examination his mental condition was such that he was uncommunicative and failed to give the VA doctors an adequate history. The evidence warrants the inference that his statement is correct.

 Commander O’Connell, it will be recalled, testified that the Physical Review Councils frequently faulted the Physical Evaluation Boards (1) for dominance by the single medical member (2) who might not be a specialist in the cause of the evaluee’s disability; and (3) for failure to apply the standards of the VA schedule with objectivity or precision. To the extent that this is true, the whole administrative decisional process might be strengthened by more careful selection of the medical members and more thorough indoctrination and training of all members of Physical Evaluation Boards.

 As an alternative, It could be said that the decision was not conscientiously made, Golding v. United States, supra, since the decisional process was deprived of its integrity by the arbitrary action of the Physical Review Council.

 Plaintiff is a citizen of the united States, born August 1, 1919, in Winchester, Virginia. He is presently residing in Arcadia, California.

 His claim, as stated in the petition, is (1) for disability retirement pay computed at the rate of 50 percent of the basic pay of a lieutenant commander with over 15 years of service, for the period commencing November 30, 1956, and ending November 29, 1961; and (2) for disability retirement pay computed at 40 percent for the period commencing November 30, 1961, and extending to the date of judgment. Such pay is to be computed under the provisions of the Career Compensation Act of 1949, as amended, 63 Stat. 802, 10 U.S.C. § § 1201-1221, and to be subject to “appropriate off-sets, if any there be,” (referring, ostensibly, to the severence pay already received).

 By agreement of counsel at the trial, and with the approval of the commissioner, the trial of the action was limited to the issues of law and fact relating to the right of plaintiff to recover, reserving determination of the amount of recovery, if any, for further proceedings.

 By the Career Compensation Act of 1949, as amended, 10 U.S.C. § § 1201-1221.

 Regulations governing the establishment and proceedings of the various Naval Medical Boards in the disposition of cases involving physical disability are found in the 1951 and 1956 Supplements to the Manual for Courts Martial, Chapter IX, sections 0900-0962.
Much of the descriptive material used In the succeeding subparagraphs of this finding was, however, taken from the testimony of defendant’s medical expert, who was presented as a specialist in the procedures.

 In the Regulations the Clinical Board is sometimes designated as the Medical Board.

 Naval Supplement to the Manual for Courts Martial, 1951, Chapter IX, section 0925a(2).

 Naval Supplements to the Manual for Courts Martial, 1951 and 1956, Chapter IX, sections 0941-0945. For the provision relating to Appellate Counsel, see section 0945(c).

 Various diagnoses were made of this condition; (1) catarrhal fever; (2) cause undetermined; (3) undulant fever; (4) cause undetermined (when ‘‘discharged to duty; fit for same”).

 This health record contains the following entry: “* * * There were no indications of any malignant psychopathological findings and the impression was that this officer is a very passive-dependent character * *

 In response to inquiry from the dispensary, where plaintiff was examined, Internal Medicine replied: “From history and physical exam I cannot explain this officer’s symptoms. It does seem that his pain comes when he moves a joint into extreme position * * *. My opinion is that no disease exists * *

 Lack or loss of the appetite for food.

 Excessive secretion of hydrochloric acid by the stomach cells.

 Tie members were: (1) J. S. Cowan, CDR, MC, USN; (2) A. R. Errion, CDR, MC, USN; and (3) R. P. Smitley, LT, MC, USN. Commander ErrioD conducted the examination of plaintiff.

 Captain George C. Thomas, Medical Corps, USN.

 Commander John E. Bacon, Supply Corps, USN, and Lieutenant Commander Clifford T. Niedzielski, USNR.

 The weight of the evidence indicates that plaintiff continued in this status until his separation in November 1956. He testified before a second Physical Evaluation Board In January 1956 that he was still on active duty. The evidence thus leaves unexplained a health entry of December 30, 1955, stating that plaintiff’s health record was terminated as of that date and he was placed on the temporary physical disability retired list.

 The five members of the Board were: (1> Captain Henry G. Bullwinkel, Medical Corps, USN; (2) Captain Robert L. Morris, USN ; (3) Commander Rees Morgan, Medical Corps, UiSN; (4) Commander John L. Slade, USNR; and (5) Commander Elmo H. Hutchison, USNR.

 The Board did not appoint counsel for plaintiff.

 He was a professor of gastrointestinal diseases at the Graduate Medical School in Philadelphia.

 Members: (1) Captain Lynn S. Beals, Jr., Medical Corps, UNS ; (2) Commander William N. Vlacbos, USNR; and (3) Lieutenant Commander Arnold Brandt, USNR. Lieutenant John Lasco, Jr., Medical Corps, USN, was present as counsel for tlie Board.

 He further testified that he was still on active duty.

 Plaintiff had endeavored to have Dr. Bockus present to testify, but Dr. Bockus was out of the city and could not attend.

 Plaintiff again appeared before the Clinical Board in person, was advised of its indicated disposition, and afforded an opportunity to submit a statement in rebuttal in writing. No rebuttal statement is in evidence.

 The members were: (1) Captain Lynn S. Beals, Jr., Medical Corps, USN, senior member and medical officer of the previous Board (of January 31) ; (2) Commander Samuel A. Sholl, USNR; and (3) Commander Herbert S. Holland, Jr., USNR. Commander Vlachos and Lieutenant Commander Brandt, members of the previous Board, were not present. Counsel for the Board on this occasion was also different. Chief Warrant Officer Ermon E. Francis, USN, serving, and Lieutenant Lasco not present.

 Provision for placement on the temporary disability retired list is contained in 10 U.S.C. § 1202, as distinguished from the authority for separation (with severance pay) in 10 U.S.C. § 1203. In either case, the Secretary must determine that the disability may be of a permanent nature; thereafter, if the rating of the disability is less than 30 percent, separation is in order; if “at least 30 percent,” placement on the temporary disability retired list follows, if the disability has not been determined to be of a permanent nature.
In the instant case, it was the rating of 20 percent which resulted in plaintiff's separation. -Given a rating of “at least 30 percent,” he could have been placed on the temporary disability retirement list, in which event he would have been subject to further physical examination and reevaluation of disability at intervals of 18 months, subject to final evaluation within 5 years, and would meanwhile have received temporary retirement pay equal to 50 percent of his basic pay.

 Members of the first Physical Review Council involved in this case are not identified by the evidence. In the present instance, the members were: (1) Captain Rodman D. Smith, USN (Personnel) ; (2) Captain Byron D. Casteel, USN (Medical) ; and (3) Commander Carl F. Paul, Jr., USNR (Judge Advocate General).

 Members: (1) Captain C. L. Denton, Medical Corps USN; (2) Captain C. E. Smith, USNR; (3) Captain M. L. McCullough, Jr., USN; (4) Captain R. Morgan, Medical Corps, USNR; and (5) Commander J. L. Slade, USNR.

 No counsel for plaintiff was appointed.

 In a later section of the directive, two men were removed from the temporary disability retired list and permanently retired for physical disabilities in excess of 30 percent.

 37 U.S.C. §§ 272 and 273 (10 U.S.C. § 1203).

 Provision for severance pay, as heretofore noted, was also included.

 Article C-10412, BuPers Manual, contained the following provision: “(1) A complete physical and dental examination shall be given to all personnel at the time of their separation, except that such examination in the cases of personnel being separated upon the approved report of a board of medical survey, a clinical board, or a physical evaluation board shall be given only if requested by the person being separated. * * *”
Article 15-49(1), Bureau of Naval Personnel Manual, contained the following provision: “* * * An officer who has appeared before a physical evaluation board incident to being separated from the active list need not be reexamined physically at the time separation is to become effective unless it is considered that his physical condition has materially changed subsequent to appearance before the physical evaluation board or unless he alleges that such is the case.

 During this period (March — November 1956) plaintiff was assigned “extremely light duties” : as permanent member of a general court martial board ; as officer in charge of a “dead” ship, being moved by towline; and as escort to a deceased officer.

 Binding 15(e).

 Binding 14(b).

 Binding 10.

 Dr. Harrison reported: “This patient has had periodic bouts of proven ‘stomach ulcer’ for approximately 15 years. The picture has likewise persisted since discharge from the service 1J4 years ago. My impression is that the condition is psychogenic in origin. He has a moderately rigid passive-aggressive personality and character structure, which does not allow for out *345 ward expression of anger and resentment. Eamilial background history substantiates this picture as regards determinants in the formative years. In addition, there are certain obsessive-compulsive features in Mr. Cooper’s rigid approach, which create severe indecision about important matters in his life. The above considerations substantiate the need for psychiatric treatment for Mr. Cooper, in my judgment. I am treating him, pro tern, on a 2 times per week basis in psychotherapy, pending disposition by your facility. Mr. Cooper is sane and competent.”

 The disability compensation under this award was $36 per month, “subject to the recoupment of severance pay in the sum of $12,355.20 * * The recoupment would require more than 26 years.

 “It is more accurate to use the term ‘peptic ulcer state,’ ” the doctor said, “because notoriously this is an illness of chronieity, with flare-ups, presumably seasonal, spring and fall * * *, with greater or- less degrees of intensification following emotional stress phenomena, which may or may not be apparent. *■ * * It is notoriously a relapsing disease.”

 The doctor continued: “I think he is a very compliant, obedient, very conscientious * * * hard-worlting individual who would, even though there was appreciable personal suffering, give the appearance of a sort of smiling and detached attitude.”

 Dr. uhley continued: “The only thing which he amplifies which I have not gone into is the fact that this is a person with what must be a very severe undercurrent of emotional stress of an inordinate degree.
“We know that perhaps the single most significant factor in producing pylorospasm is stress of an emotional origin. The patient may not be aware of how distressed he is emotionally. * * *”

 While he did not address himself specifically to the VA Code category of “moderate” as distinguished from “moderately severe,” he did say: “The difference might be whether this was severe or total incapacitation, or only moderately severe. I can’t see there would he any greater leeway than that.”

 Occasional symptoms of psychiatric difficulty had appeared while he was in active service, but they were never pronounced, or deemed serious enough to warrant treatment.

 The recurring episodes of severe symptoms occurred more than two or three times a year, averaging a week or more in duration, and moderate (or worse) manifestations were continuous.

 There were also, as found by the de novo Physical Evaluation Board in March 1956, “continuous manifestations of * * * impairment of health.” Continuous manifestations of anemia or of malnutrition are not established by the evidence.